NATIONAL NUTRITIONAL FOODS AS-SOCIATION; David T. Ajay, d/b/a Dave's Diet and Nutrition Foods; Sid Cammy, d/b/a The Diet Shop; and Max Huberman, d/b/a Natural Health Foods, Plaintiffs,

v.

Elizabeth M. WHELAN, Sc. D., and Fredrick J. Stare, M. D., Defendants.

No. 78 Civ. 6276.

United States District Court, S. D. New York.

June 25, 1980.

Bass, Ullman & Lustigman, New York City, for plaintiffs, Robert Ullman, Joan Licht Mantel, New York City, of counsel.

Thacher, Proffitt & Wood, New York City, for defendants, Robert S. Stitt, G. W. Taliaferro, Jr., New York City, of counsel.

## OPINION

SOFAER, District Judge:

This is an action for libel, conspiracy and prima facie tort brought against a nutritionist, Elizabeth M. Whelan, and a physician specializing in nutrition, Fredrick J. Stare, by National Nutritional Foods Association ("NNFA"), a trade association of retailers, manufacturers and distributors in the health food industry and three individual members of the Association, all of whom are in the retail health food business.[1] Jur-

---

1. Plaintiff NNFA is an Illinois corporation with its principal offices in California. It is the largest representative and voice in the United States of retailers, manufacturers and distributors of products commonly known as "health-food products," i. e., vitamins, minerals, nutritional foods and food supplements. NNFA expends large sums of money in the promotion and publicity of health-food products and health-food stores within the health-food industry and to members of the consuming public.

Complaint ¶¶ 3–4; Pltfs' Mem., 2–3. Plaintiffs David T. Ajay, d/b/a Dave's Diet and Nutrition Foods, Sid Cammy, d/b/a The Diet Shop, and Max Huberman, d/b/a Natural Health Foods, are engaged in the sale and distribution of health food products in, respectively, California, New Jersey, and Ohio. Complaint §§ 5–7. Plaintiffs Ajay and Cammy were, at all relevant times, members of NNFA's executive council, and plaintiff Huberman was NNFA's president. Defs.' 9(g) Statement, ¶¶ 2–4.

isdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

Plaintiffs claim they have been libeled, defamed, and commercially injured by a conspiracy dedicated to destroying or injuring the health-food industry, and in particular by publications written by the two named defendants. Defendants have moved for summary judgment and dismissal pursuant to Fed.R.Civ.P. 12(b)(6) and 56. For the reasons stated below, defendants' motion is granted.

## I. *Allegations of the Parties*

### A. *The Complaint*

Plaintiffs allege in Count I that "the defendants have maliciously engaged in a combination and conspiracy with each other, with the American Council on Science and Health . . ., and individual members thereof, with columnist Ann Landers, and with nutritionists, columnists and other food industry figures, to defame, injure, disparage, damage and destroy the business of members of plaintiff NNFA and plaintiffs" Ajay, Cammy and Huberman. (Complaint ¶ 12) Plaintiffs claim that in furtherance of this conspiracy defendants took the following actions:

(1) participated in forming the American Council on Science and Health "as a vehicle for disparaging the health food industry and deprecating natural foods advocated [and sold] by plaintiffs;" (*Id.* ¶ 13(a))

(2) "acting individually and in concert" with the other conspirators, "disseminated false and defamatory remarks with respect to plaintiffs and the health food industry," including press releases, articles, and books "falsely and maliciously deriding and debasing the value of health food products," and their sellers. The false statements allegedly advanced by defendants and their co-conspirators are that health food products and stores are " 'rip-offs,' 'quackery' and a threat to the pocketbook of the consumer;" (*Id.* ¶¶ 13(b), (c), (d))

(3) "maliciously advised members of the consumer public to cease and avoid the purchase of health food products and natural foods as distributed in health food stores such as those of plaintiffs." In particular, plaintiffs allege, defendants authored three disparaging publications: a book entitled *"Panic in the Pantry—Food Facts, Fads and Fallacies"*; an article entitled "The Big Health Rip-Offs," appearing in the January 1978 issue of *Harper's Bazaar*; and a newspaper column in the *San Jose News* under the heading "Food and Your Health" and "Natural Food Vitamins Called Rip-Offs." (*Id.* ¶¶ 13(e), (f), (g), (h))

These activities, plaintiffs claim, have discredited "the reputation, prestige and goodwill of the plaintiffs," and have injured their businesses, reputations, and trade names. (*Id.* ¶¶ 14(a), (b)) Despite the numerous references in Count I to defamation, plaintiffs' intent there is to plead a "prima facie tort." Pltfs' Mem., p. 4. They claim injury and damages due to this tort "in an amount presently unascertainable, but which is at least $100,000." (Complaint ¶ 28) Count II realleges the conspiracy to commit prima facie tort, and seeks to enjoin defendants from further engaging in it.

Plaintiffs also claim libel or defamation. Count III charges that the article appearing in *Harper's Bazaar* was "false and knowingly spiteful and maliciously written and published" by the defendants. (¶ 21) The article in general laments the fact that "advocates of health foods have managed to convince a significant portion of the population that organically grown food is more nutritious and safer than 'regular' food. . ." The specific statements in this article, said to be actionable, are (1) the term "rip-off" (defendants call the health food fad a nutritional "rip-off," not only of the pocket book but of the public's health); (2) the term "quack" or "quackery" (defendants refer to "vitamin quacks" and "health quackery"); and (3) the claim that the products are sold at great markups (e. g., "The only thing unusually healthy about 'organic' foods is the markup or their price . . ."). (*Id.* ¶ 20) These statements, plaintiffs assert, "were intended to be understood and were

understood by the reading public, as relating and referring to plaintiffs and their businesses of selling health food products." (*Id.* ¶ 22) Defendants allegedly knew these statements were false when made or failed to take proper steps to ascertain their truthfulness, and instead published them with reckless disregard for their truthfulness. (*Id.* ¶ 26)

Count IV claims that defendants republished the false and defamatory material alleged in Count III in the *San Jose News*, San Jose, California, on July 5, 1978. The gist of the alleged defamations is the same in both articles, though the later piece uses slightly different language, and refers to "health foods, megavitamins and laetrile" as "three nutrition-related health rip-offs," on the "list of current-day health quackery. . . ." (*Id.* ¶ 30) The same allegations as in Count III are made concerning defendants' intent ("spiteful and malicious"), knowledge (knowing the statements to be false or recklessly disregarding falsity), and purpose (to lead the reading public to understand that plaintiffs were guilty of deceit and overcharging). Both counts also claim damages "in a sum presently unascertainable but which is at least $100,000." Finally, Count V seeks "One Million Dollars" in punitive damages, charging defendants with acting in a "malicious, wilful and grossly irresponsible" manner. (*Id.* ¶¶ 39–40)

### B. *Defendants' Contentions*

Defendants are prominent nutritionists. Dr. Whelan is a research associate with the Department of Nutrition of the Harvard School of Public Health and executive director of the American Council on Science and Health. She is author or co-author of several books and numerous articles. Whelan Aff., p. 2. Dr. Stare is a nutritionist, biochemist and physician. He founded the Department of Nutrition at the Harvard School of Public Health, and was its chairman from 1942–1976. He continues at Harvard as a Professor of Nutrition, and is a member of the Board of Directors and Board of Advisors of the American Council on Science and Health. He, too, has written several books and articles, including *Panic in the Pantry* with Dr. Whelan as co-author. Stare Aff., p. 2.

Defendants admit and adhere to the statements they made in the publications quoted by plaintiffs. They claim their statements were and remain true. Furthermore, they note that their written statements are essentially the same as those made over the last few years by numerous other commentators, including government officials, on an issue of public concern. They also deny any conspiracy or intent to defame the individual plaintiffs, pointing out that none of the publications relied upon by plaintiffs refers to any of the plaintiffs individually. *Panic in the Pantry*, they claim, is the outgrowth of considerable professional knowledge and research, received the approval of noted authorities, and contains no statements defendants believed to be untrue. Both the *Harper's Bazaar* piece and the *San Jose News* article also were allegedly researched with care, and contain only material the defendants believed was true. Defendants have invited plaintiffs to examine their entire bibliography and research files, and the notes upon which the allegedly defamatory publications are based. Defs' Mem. p. 6.

### II. *The Standards for Summary Judgment*

Is there "no genuine issue as to any material fact" in this case? If not, is the moving party "entitled to a judgment as a matter of law"? These straightforward questions state the two prerequisites of summary judgment under Rule 56, F.R.C.P. Yet, answering these questions has been anything but simple.

Particular uncertainty has recently been generated concerning summary judgment in the area of libel and defamation. The virtually universal rule in defamation cases to which *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) applied, was until recently that summary judgment should be liberally granted. "The threat of being put to the defense of a lawsuit," Judge J. Skelly Wright reasoned,

"may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). *Accord, Schuster v. U.S. News & World Report, Inc.,* 602 F.2d 850, 854–55 (8th Cir.1979); *Herbert v. Lando,* 568 F.2d 974, 980 (2d Cir.1977), *rev'd,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Anderson v. Stanco Sports Library, Inc.,* 542 F.2d 638, 641 (4th Cir.1976); *Time, Inc. v. McLaney,* 406 F.2d 565, 566 (5th Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

This approach was rooted as deeply as judicial precedents can reach. In *New York Times Co. v. Sullivan, supra,* the Supreme Court effectively awarded summary judgment by refusing to allow a retrial on a record which appears to have had enough evidence of wilful falsity, or reckless disregard of the truth, to have precluded summary judgment under conventional rules. *See* 376 U.S. at 279, 84 S.Ct. at 725. And the need to avoid allowing the costs of litigation to chill protected speech was stressed again in *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967).

Nevertheless, the Supreme Court shifted its position in *Herbert v. Lando,* 441 U.S. 153, 175–79, 99 S.Ct. 1635, 1648–1650, 60 L.Ed.2d 115 (1979), where it ruled that defamation actions should be treated no differently than other cases for discovery purposes. The message took a theme familiar to summary judgment *cognescienti* when the Supreme Court expressed "some doubt about the so-called 'rule'," because proof of " 'actual malice' calls a defendant's state of mind into question" and therefore "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 (1979). Judge Oakes, writing for the Second Circuit in *Yiamouyiannis v. Consumers Union of U.S., Inc.,* 619 F.2d 932 at 940 (2d Cir.1980), reviewed these cases and concluded: "Until more directly advised, we think that this neutral approach correctly states the rule as it is presently in force: neither grant nor denial of a motion for summary judgment is to be preferred."

Judge Oakes has spoken for this Circuit, and wisely. Nevertheless, the consequences of abandoning the special rule forged for defamation cases should be noted. They are precisely the results predicted by those Justices and Judges who were led, in the first instance, to advocate the special rule.[2] To deal with a complaint alleging libel after abandonment of the rule will much more frequently require full-fledged discovery and trial, with the attendant costs. Summary judgment will now be safely granted in libel cases only after it is shown that a sufficient opportunity for discovery has been permitted, and only after the trial judge has made a detailed evaluation of the evidence relating to wilfulness or reckless disregard. The effort this will require is clearly demonstrated by Judge Oakes' meticulous and careful opinion in *Yiamouyiannis,* where he was forced, in upholding District Judge Owen's grant of summary judgment, to review all the evidence. Only after such a review was he able to conclude with assurance that no reasonable jury could find malice under the circumstances. *Id.* at 940. Few judges at any level can be expected consistently to make this kind of effort, even to prevent harassment of individuals engaged in protected speech.

Despite the uncertainties involved, summary judgment is warranted in this case. Plaintiffs have complicated the issues here by alleging actual malice, and by advancing a claim of prima facie tort. But all the claims asserted are, on examination, legally insufficient.

III. *Sufficiency of the Libel Claims*

■ Plaintiffs claim that defendants' libeled and defamed them in two separate publications—the *Harper's Bazaar* article, and a newspaper story in the *San Jose*

---

**2.** No one is more aware of the interplay between procedure and substance in the area of defamation than Judge Oakes, whose thought- ful comments may be found in Oakes, *Proof of Actual Malice in Defamation Actions: An Unsolved Dilemma,* 7 Hofstra L.Rev. 655 (1979).

*News.* The alleged libels are the same in both articles, and indeed are essentially the same as the statements made by defendants in *Panic in the Pantry,* upon which a libel claim would be time-barred.[3] Treating the articles in Counts III and IV as separate publications, however, they still provide no basis for a cause of action. New York law, which both parties assume applies, requires plaintiffs to prove that defendants used (1) defamatory words; (2) against plaintiffs; (3) that were untrue; and (4) that caused special damages. When the alleged libel concerns a public issue, the requirements of proof are even more exacting. Plaintiffs have met none of these requirements.

■ In an ordinary commercial case, where the alleged libel is addressed to a specific person or business, some of the phrases used by defendants might be facially defamatory or defamatory by innuendo. In the context of a general criticism of a group, however, expressions such as "quackery," "rip-off" or excessive prices, and a charge of phony claims, do not seem sufficiently condemnatory under New York law to amount to defamation. Even if applied to individuals in the manner obviously intended here, the phrases are critical, but appear mild in their import. Had defendants called a physician a "quack," or had they accused specific merchants such as plaintiffs of illegal practices, the expressions would have been sufficiently defamatory. But the criticisms sued upon here are in such common use as synonyms for "sharp" rather than illegal practices that,

absent some context in which they take on special force, they are too mild to serve as a basis on which to permit suit. *See generally Cole Fisher Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 288 N.Y.S.2d 556 (1st Dep't 1968), *aff'd,* 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 633 (1969).

■ Plaintiffs have failed to prove, moreover, that the alleged libels were addressed to them individually. New York follows the general common law rule, applied since *The King v. Alme & Nott,* 3 Salk. 224, 91 Eng.Rep. 790 (1699), that group libel is not actionable. Only when the class defamed is sufficiently small that the disparaging terms can be said to apply to all its members may a member of the group, or a representative such as NNFA, sue for defamation. *Gross v. Cantor,* 270 N.Y. 93, 200 N.E. 592 (1936); *Schutzman v. News Syndicate Co.,* 60 Misc.2d 827, 304 N.Y.S.2d 167, 169 (Sup.Ct. Nassau Co. 1969). The general issue was addressed by Judge Kaufman, in *Neiman-Marcus v. Lait,* 13 F.R.D. 311, 316 (S.D.N.Y.1952):

> Where the group or class disparaged is a large one, absent circumstances pointing to a particular plaintiff as the person defamed, no individual member of the group or class has a cause of action. *Restatement of Torts,* § 564(c); Gatley, *Libel and Slander* (3rd ed. 1938) pp. 123–124.

■ None of the alleged libels in any manner named or specifically suggested any of the plaintiffs.[4] NNFA concededly repre-

---

**3.** N.Y. CPLR § 215(3) provides that actions for libel must be commenced within one year. The libel counts in the complaint (Counts III and IV) do not specifically refer to *Panic in the Pantry,* except insofar as they incorporate by reference the allegations in Count I of the complaint. *Panic in the Pantry* cannot be the predicate for damages in libel since it was published in 1977 in paperback, more than one year before plaintiffs filed their complaint.

**4.** Plaintiffs need not be named in the allegedly defamatory publication to recover, and "may give evidence of all the surrounding circumstances and other extraneous facts" to elucidate the reference. *Cole Fisher Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 288 N.Y.S.2d 556, 561–62 (1st Dep't, 1968). But as made

clear in *Rogow,* which dealt with an alleged libel to a business:

> . . . [T]he language used must tend directly to injure plaintiff in its business, profession or trade, and must "impute to the plaintiff some quality which would be detrimental, or the absence of some quality which is essential to the successful carrying on of his office, profession or trade" (Gatley on Libel and Slander (6th ed.) p. 34). Since plaintiff relies on the alleged innuendo meaning of the language, it should plead such meaning, the special facts necessary to support its contention, and also plead special knowledge possessed by those to whom the words were published which support that

sents a class. The other plaintiffs are merely three of thousands of individuals engaged in the health food business. Many of these same plaintiffs have, moreover, brought a prior similar suit against the Food and Drug Administration, which was dismissed by District Judge Coolahan in New Jersey as a group-defamation claim. Nothing has been alleged or presented that distinguishes the plaintiffs here from those deemed to be attempting to represent a group in that case, and Judge Coolahan's reasoning is apposite:

> The Court holds that the alleged "defamation" of the "health food industry" through use by the Government of the terms "quacks", "faddists", and "shotgun mixtures," is not actionable under common law principles even were the *Barr v. Matteo* doctrine not available to the Government here. While it is true that a corporation may have a cause of action in defamation, *Aetna Life Ins. Co. v. Mutual Benefit Health & Acc. Ass'n*, 82 F.2d 115 (8 Cir.1936); *Boston Nutrition Society v. Stare*, 342 Mass. 439, 173 N.E.2d 812 (1961), this Court holds that an entire industry, such as the health food processing industry, cannot sue on grounds of defamation.

*Ajay Nutrition Foods, Inc. v. FDA*, 378 F.Supp. 210, 218 (D.N.J.1974), *aff'd*, 513 F.2d 625 (3d Cir.1975).

Defendants also argue that judgment should be granted in their favor because nothing they have said about the health food industry is false. Each of the opinions expressed by defendants about the health food industry has a sufficient basis in fact or responsible opinion to make it impossible to believe that plaintiffs could prove falsity. Misuse of the term "organic" has been widely condemned.[5] Health food store prices have been shown often to be higher than prices for comparable products in other food stores.[6] Persons advocating or selling health food items have been found to give improper health advice, amounting to "quackery," and to make unsupportable claims for health food products and vitamins.[7] Defendants have supported each of their allegations with references to books, reports, and other publications, excerpts of which are quoted in their affidavits and appended as exhibits. This literature, including a report by a federal agency, supports each of defendant's assertions to an extent sufficient to require plaintiffs to come forward with evidence of falsity, rather than mere conclusions, to survive this motion; they "may not rest upon mere conclusory allegations or denials." *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

Nor have plaintiffs met the requirement of sufficiently alleging special damages. They claim actual damages of "at least

meaning (see Gatley on Libel and Slander (6th ed.) p. 52). . . . 288 N.Y.S.2d at 562. A recent decision, very much on point but applying Minnesota law, is *Schuster v. U.S. News & World Report*, 459 F.Supp. 973 (D.Minn.1978), *aff'd*, 602 F.2d 850 (8th Cir.1979).

5. Defendants have supplied the court with numerous uncontroverted quotations from, or photocopied excerpts of, articles, books and reports where the use of the term "organic" is criticized. The following statement, quoted from *Staff Report and Recommendations Federal Trade Commission*, September 25, 1978, p. 238, is representative:

> Given the existence of consumer beliefs that "organic" foods are higher in nutrient content and/or safer than other foods, the next question is to be resolved is whether those beliefs are accurate. The record overwhelmingly demonstrates, through the testimony of

soil scientists, nutritionists, fertilizer experts, pesticide experts, and others, that there is absolutely no difference between "organic" foods and "non-organic" foods in terms of either nutrient content or safety. Indeed, much of the resistance to the use of the term stems from the fact that there is no difference between "organic" and "non-organic" food, thus leading to the conclusion that the distinction drawn is spurious from a scientific standpoint.

Defs.' 9(g) statement, ¶ 44. *See also* Whalen Exh. 2; Stare Exhibits 3, 4, 6, 7, 8, 9 p. 1, 11, and 13.

6. Whalen Exhibits 2 p. 26, 4 pp. 9–10; Stare Exhibits 2, 3 p. 3, 5, 6, 7, 8, 10, 13 and 14.

7. Defendants' amply support this opinion with references to literature dealing with the issue. Stare Exhibits 1, 2, 6, 9 pp. 1–2, 11 and 12.

$100,000," but state no basis for any part of this amount. The notion that the Stare and Whalen writings in *Harper's Bazaar* and the *San Jose News* could have caused any ascertainable damage is so dubious, that plaintiffs should be obliged to advance at least some details or tenable theory of damages. They have done neither, and punitive damages are no substitute.

 Finally, both New York law, and the federal Constitution, undoubtedly impose upon plaintiffs an additional burden of proof in a case such as this. Under New York law, when a matter of public interest is involved, a private plaintiff is required to prove that the publisher acted with gross irresponsibility. *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 571 (1975). Similarly, the First Amendment protects, and thereby encourages, statements on matters of public interest; the qualities and marketing of health foods is certainly such a subject. *E. g., Konigsberg v. Time, Inc.,* 312 F.Supp. 848, 852 (S.D.N.Y.1970). Where the individual or group defamed is a "public figure," the plaintiff must convincingly demonstrate intentional falsity or a reckless disregard for the truth. NNFA qualifies as a public figure since, by its own admission, *see* Pltfs.' Mem., 2–3, it has thrust itself to the forefront of public attention on a controversial matter of great public importance. See Judge Tamm's particularly helpful opinion in *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.1980). Since the individual plaintiffs are suing on the basis of allegations made against the class they represent, moreover, they should be treated in the same manner as NNFA.

Under the stringent New York and federal tests, plaintiffs' suit must be dismissed for the additional reason that they have failed convincingly to show that a reasonable jury could find gross irresponsibility, or willful falsity, or reckless disregard of the truth. Even assuming that defendants have made some errors in their numerous publications, no issue of fact concerning intentional falsity has been raised. Indeed,

defendants have opened their files to plaintiffs to allow a full examination of the basis for their writings. Still, plaintiffs have failed to allege a single fact to support their repeated claims of wilful falsity. *Compare Herbert v. Lando, supra.* The discovery afforded here of defendants' files is ample in light of the insubstantial proof of falsity and damage.

## IV. *Prima-Facie Tort*

Plaintiffs allege a conspiracy by defendants and others to damage the health food industry and specifically the businesses of the individual plaintiffs. This allegedly intentional and malicious infliction of harm is actionable, plaintiffs contend, as a "prima facie" tort.

 The "prima facie" tort is rooted in the wise notion that no system of law can completely describe all claims deserving relief. In *Aikens v. Wisconsin,* 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154 (1904) Justice Holmes sustained a state statute that imposed criminal penalties for any "willful or malicious" combination to injure a person's reputation, trade, business or profession. He noted that other courts had found "such a combination followed by damage would be actionable even at common law. It has been considered," he noted with apparent approval, "that, *prima facie,* the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape." *Id.* 204, 25 S.Ct. 5. The New York courts, since that time, have entertained, and been entertained by, a series of claims in "prima facie" tort. They have accepted the concept, but only for the purpose and with the limitations suggested by Justice Holmes. Plaintiffs fail to bring their claim within the purpose of the prima facie tort doctrine, and are barred by the limitations evolved by New York's courts.

 First, and most generally, the prima facie tort is aimed at providing relief for the intentional infliction of harm under circumstances that do not lend themselves to categorization as one of the traditional

causes of action. "The need for the doctrine of prima facie tort arises only because the specific acts relied upon—and which it is asserted caused the injury—are not, in the absence of the intention to harm, tortious, unlawful, and therefore, actionable." The harm, to constitute a prima facie tort, must emanate from "an act or a series of acts which would otherwise be lawful." Where the complaint relies "only on specific unlawful and tortious acts, the remedy is not in prima facie tort." *Ruza v. Ruza*, 286 A.D. 767, 146 N.Y.S.2d 808, 811 (1st Dep't 1955) (Breitel, J.). Resort to a notion that deems conduct "prima facie" tortious is therefore reserved for those cases in which the conduct falls outside the ordinary "categories of tort," *Advance Music Corp. v. American Tobacco Co.*, 296 N.Y. 79, 84, 70 N.E.2d 401, 403 (1946), or amounts to no "traditional tort," *Brandt v. Winchell*, 283 A.D. 338, 127 N.Y.S.2d 865 (1st Dep't 1954).

 Strictly stated, the theory suggests a rule both reasonable and manageable: a prima facie tort may not rest upon conduct that is well within the area of activity meant to be regulated by a traditional tort, and which is insufficient to establish that tort.

Plaintiffs' charge of prima facie tort sounds in defamation. A conspiracy is alleged, but it is a conspiracy to injure plaintiffs through publications (interviews, press releases, articles, books). The specific acts charged are "recognized as tortious in the law" as defamation, and therefore "the remedies lie only in the classic categories of tort." *Ruza v. Ruza, supra*, 146 N.Y.S.2d at 810. In *Holt v. Columbia Broadcasting System, Inc.*, 22 A.D.2d 791, 253 N.Y.S.2d 1020 (2d Dep't 1964), the court specifically found that "a cause of action based on alleged prima facie tort is insufficient when its basic allegations constitute grounds for a cause of action based on a 'traditional tort' such as libel."

The difficulty with this conclusion is that the New York Court of Appeals has adopted a more liberal—or at least a more "refined"—view on the issue at the pleading stage. In *Morrison v. National Broadcasting Co.*, 24 A.D.2d 284, 266 N.Y.S.2d 406, 412 (1st Dep't 1965), then Justice Breitel made clear that prima facie tort was not merely another, narrowly defined class of action, but one that could be pleaded alternatively with other, traditional causes of action, at least where the proper, ultimate basis for relief was in doubt. The Court of Appeals reversed on other grounds, discussed below. *Morrison v. National Broadcasting Co., Inc.*, 19 N.Y.2d 453, 280 N.Y. S.2d 641, 227 N.E.2d 572 (1967). But it thereafter accepted Chief Judge Breitel's view, allowing a prima facie tort to be pleaded alternatively in *Board of Ed., Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Ass'n, Inc.*, 38 N.Y.2d 397, 380 N.Y.2d 635, 645, 343 N.E.2d 278, 284 (1975). The Appellate Division ruled there that "a cause of action in prima facie tort cannot exist where all the damages sustained are attributable to a specific recognized tort . . . ." The facts allegedly establishing the prima facie tort were essentially those pleaded to establish the traditional tort of abuse of process. But Judge Wachtler, writing for a unanimous Court of Appeals, approved the use of alternative pleading. He noted that "double recoveries will not be allowed, and once a traditional tort has been established the allegation with respect to prima facie tort will be rendered academic. Nevertheless there may be instances where the traditional tort cause of action will fail and plaintiff should be permitted to assert this alternative claim."

This refinement arguably gives plaintiffs' case some strength. An alternative pleading of prima facie tort seems permitted under *Farmingdale* even though identical facts underlie the prima facie tort and defamation claims. A close reading of *Farmingdale*, however, supports a more limited view of the Court's willingness to accept claims of prima facie tort, even at the pleading stage.

In *Farmingdale* the Court clearly regarded the facts alleged by plaintiff as constituting a facially sufficient claim of the tort of abuse-of-process. The defendant's conduct

there, in other words, was not only within the area intended to be regulated by abuse-of-process doctrine, it was conduct that the doctrine made unlawful. Alternative pleading of prima facie tort in such a case served as a device to enable plaintiff to assert what appeared to be a meritorious claim under a different theory. Under those circumstances, the Court of Appeals wanted to enable plaintiff to assert this alternative claim in the event, for some unanticipated reason, "the traditional tort cause of action will fail. . . ." 380 N.Y.S.2d at 645, 343 N.E.2d at 285.

■ The First Department recently confirmed this construction of *Farmingdale* by ruling that the prima facie tort should not be used to set "aside large bodies of case law which have defined our limits, established our guidelines and set forth the essential elements of traditional tort." *Belsky v. Lowenthal*, 62 A.D.2d 319, 405 N.Y. S.2d 62, 65 (1st Dep't 1978). Its decision was affirmed unanimously by the Court of Appeals "for the reasons stated in the opinion of Mr. Justice Herbert B. Evans." 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979). Where the conduct alleged is implicitly or explicitly permitted by traditional doctrine, the catch-all prima facie tort has no useful service to perform. If the conduct is to be proscribed, the straightforward way to do it is to revise traditional doctrine to punish what has gone unpunished. By contrast, where the complaint's pleading appears to be sufficient to establish a traditional tort, as in *Farmingdale*, the prima facie tort doctrine serves the useful function of providing an alternative rationale for relief in the event some technicality or other unimportant shortcoming prevents relief under the traditional rubric.

Applying this construction of the New York cases to plaintiffs' allegations, the prima facie tort claim must be dismissed. The defamation counts are not only insufficient, they are insufficient for reasons that reflect policy determinations implicit in New York libel law to protect the forms of expression adopted by defendants. It would make no sense, for example, to deem certain expressions immune from suit as libel, and then find them sufficient in the identical factual context to constitute a prima facie tort; or to make truth an absolute defense in libel and defamation suits, but then to allow a prima facie tort claim based on the same facts merely because defendant was motivated by ill will and caused economic injury; or to prohibit actions based on class defamation, and then to allow such actions under a different theory; or to recognize a first-amendment interest in protecting a form of public debate, and then to deny such recognition by applying a new label. In short, the underlying reasons that justify dismissal of plaintiffs' defamation claims apply with equal force to their claim of prima facie tort.

Thus, in *Morrison v. National Broadcasting Co., Inc.*, 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967), the Court of Appeals refused to allow plaintiff to use a claim of prima facie tort as a device for avoiding the statute of limitations governing defamation. The complaint there alleged an injury identical to that which would have occurred had the defendant's conduct constituted defamation; consequently, the Court concluded "it would be highly unreal and unreasonable to apply some Statute of Limitations other than the one which the Legislature has prescribed for the traditional defamatory torts of libel and slander." *Id.*, 280 N.Y.S.2d at 644, 227 N.E.2d at 574. *Accord, Clark v. New York Telephone Co.*, 41 N.Y.2d 1069, 396 N.Y.S.2d 177, 178, 364 N.E.2d 841, 842 (1977) (action in prima facie tort barred when defamation action based on same events barred). *Cf. Mishkin v. Dormer*, 57 A.D.2d 795, 395 N.Y. S.2d 452, 453 (1st Dep't 1977) ("appropriate time period is determined by the underlying acts").

Furthermore, the complaint fails adequately to allege special damages caused by the prima facie tort. *Nichols v. Item Publishers*, 309 N.Y. 596, 602, 132 N.E.2d 860 (1956). In *Morrison, supra*, plaintiff complained that his reputation as a scholar had been injured by his unknowing participation in the "rigged" TV quiz show "21." His

demand for $7,500 special damages, arising from denials by foundations of fellowship applications, was held inadequate. 280 N.Y.S.2d at 644, 227 N.E.2d at 574. It follows that plaintiffs' conclusory and vague claims of damage in this case are inadequate under New York law. Indeed, plaintiffs here fail even to allege special damages, as required by New York law, so their complaint is fatally defective. *ATI, Inc. v. Ruder & Finn, Inc.*, 42 N.Y.2d 454, 398 N.Y.S.2d 864, 866, 368 N.E.2d 1230, 1231 (1977).

Related to plaintiffs' failure sufficiently to allege special damages is the fact that it relies ultimately upon a prima facie tort inflicted upon an industry. Not a single allegedly offending interview or publication even mentions any individual health-food retailer, including the individual plaintiffs. Health-food retailers are in general criticized for charging unjustifiably high prices, and for encouraging customers to buy unnecessary goods. But no claim is made that all retailers engage in improper practices. Finally, no proof is offered by plaintiffs that any decline in their sales or profits is due to defendants'· publications, other than an asserted belief that it is so. In *ATI, Inc. v. Ruder & Finn, Inc.*, *supra*, 398 N.Y.S.2d at 867–68, 368 N.E.2d at 1232–1233, the Court of Appeals found a complaint in prima facie tort insufficient where it asserted a harm inflicted upon "the entire aerosol industry," a plaintiff group far smaller and more easily identified than the over 10,000 retail establishments that could reasonably be deemed health-food stores. *See also Oma v. Hillman Periodicals*, 281 A.D. 240, 118 N.Y.S.2d 720, 723 (1st Dep't 1953).

█ Finally, plaintiffs' prima facie tort claim must be rejected because defendants have shown ample justification for their statements and publications. *ATI, Inc. v. Ruder & Finn, Inc.*, *supra*, written for the Court by Chief Judge Lawrence Cooke, is particularly instructive on this point. Plaintiff there, a manufacturer of aerosol products, sued the defendant public relations firm for cooperating with the environmental law firm, NRDC, in seeking to ban or limit the use of aerosols because of their possible impact on the earth's ozone layer. Plaintiff claimed that defendant's purpose in this endeavor, performed through defendant's "public interest" subsidiary PIPR, was to intimidate plaintiff into retaining defendant to combat adverse publicity concerning aerosols that defendant had helped NRDC to generate. Plaintiff's allegation was substantial enough to lead the Court to assume defendant had acted in a "morally reprehensible" manner. 398 N.Y.S.2d at 868, 368 N.E.2d at 1233.

Despite this assumed intention to harm plaintiff, the Court found plaintiff had failed to show defendant had acted "without excuse or justification." A social justification for defendant's conduct was "apparent," since "some scientists . . . subscribed to the ozone depletion theory," federal regulations had been proposed, and a potential health hazard recognized. That defendant's subjective motivation might have been malicious "has not been recognized as actionable in circumstances where allegations of possible wrongdoing are acted upon by government agencies . . ." Whatever defendants' motivation, the net effect is that various agencies of government, which are presumed to have acted properly, found a reasonable basis for concluding that aerosols may damage the environment and this must be deemed a justification which the law will recognize." This conclusion was necessary either because of the need "to prevent law suits such as this from discouraging others from alerting the public to the dangers of a product, or simply to prevent the makers of a potentially harmful product from attempting to recover their losses resulting from public awareness by claiming that the 'gadfly' was motivated by ill will . . . ." *Id.* 398 N.Y. S.2d at 867, 368 N.E.2d at 1233.

█ The New York courts would certainly dismiss NNFA's prima facie tort claim on the basis of *ATI*. The conduct attributed to defendants Whelan and Stare is in fact far less egregious than the "morally reprehensible" motivation attributed to Ruder & Finn. Perhaps dismissal under

Rule 12(b) would be procedurally questionable because plaintiff has alleged defendants acted without justification. But the summary judgment papers overwhelmingly demonstrate that: (1) many scientists agree with defendants, who are themselves recognized experts in nutrition; (2) potential health hazards and consumer frauds have been recognized by several authorities, and by responsible government agencies; and (3) regulations have been proposed to deal with these hazards and frauds. New York policy under these circumstances is to prevent suits against "gadflies" such as defendants, even assuming they were motivated by ill will, in order to avoid discouraging others from alerting the public to dangers, and to prevent the purveyors of potentially harmful products from attempting to recover losses resulting from public awareness. The public's gain from activities such as those engaged in by defendants clearly outweighs the harm to groups and individuals such as plaintiffs. *See generally* Annot., *Prima Facie Tort*, 16 A.L.R.3d 1191, 1220–27 (1967).

Accordingly, summary judgment is granted to defendants on all counts alleged in the complaint. F.R.C.P. 56. Defendants are hereby granted ordinary costs, but their claim for counsel fees is denied. The many prior suits brought by NNFA, Ajay and other plaintiffs are sufficiently distinguishable from this action to preclude a finding that plaintiffs acted in bad faith. Any further suit by plaintiffs against critics of the health food industry should, however, be scrutinized carefully to determine whether it was brought in good faith. *See Nemeroff v. Abelson*, 620 F.2d 339 (2d Cir.1980).

SO ORDERED.