**WESTERN MEAT COMPANY, INC., Plaintiff,**

v.

**IBP, INC., f/k/a Iowa Beef Products, Inc. and Arthur Stern Meat Co., Inc., Defendants.**

No. 86 Civ. 2134 (RLC).

United States District Court, S.D. New York.

March 1, 1988.

Morris M. Karp, New York City, for plaintiff.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant IBP, Inc.; Janet P. Kane, Mitchell K. Aaron, of counsel.

Jerome M. Luks, New York City, for defendant Arthur Stern Meat Co., Inc.

## OPINION

ROBERT L. CARTER, District Judge.

In this diversity action, Western Meat Company, Inc. ("Western Meat"), a New York wholesale meat merchant, alleges that its principal supplier and one of its competitors maliciously and unlawfully conspired to drive it out of business. On the pleadings, affidavits, and discovery materials presented to the court, the defendants move for summary judgment and an order dismissing the complaint pursuant to Rule 56, F.R.Civ.P.

*Background*

Once a profitable meat wholesaler at the Hunt's Point Co-operative in New York, Western Meat went out of business in March, 1985. For approximately twenty-five years, it had purchased meat from Iowa Beef Products, Inc. ("IBP"), a slaughterer that distributes carcasses to meat wholesalers. Because its customers demanded a very high grade of beef, Western Meat purchased almost exclusively "grade 1 or 2" beef, produced by Holstein cattle weighing more than 900 pounds. IBP became the plaintiff's principal supplier.

Arthur Stern Meat Co., Inc. ("Stern"), also operated out of Hunt's Point and purchased meat from IBP for more than twenty years. Stern usually bought a lower grade of beef, known as "grade 3, 4, or 5" meat, produced by native cattle in the 600–900 range.

On July 30, 1984, Western Meat received its last shipment of IBP beef. David Layhee, an IBP vice-president for sales and marketing, informed the plaintiff that IBP could no longer supply the type of beef that Western Meat needed: "[O]ur inability

to service your needs is created by a combination of reduced production numbers by IBP's kills, the unavailability of the type of carcasses that you prefer, and our need for the other carcasses in our own breaking plants." Layhee Letter, Sept. 4, 1984, ¶ 2; *see* IBP's Rule 3(g) Statement, ¶ 11. IBP now offers another explanation for its cessation of shipments to the plaintiff: Western Meat's checks to IBP were returned frequently for lack of sufficient funds.

Joseph Staiman, the president of Western Meat, flew to Iowa in October, 1984, to confront IBP officials about their decision to discontinue his shipments. He alleges that on this trip he learned of an illicit deal between IBP and Stern to drive him out of business. Staiman contends that Charles Mostek, an IBP vice-president; Thomas Connell, an IBP executive in charge of the plaintiff's account, and Burt Wartell, the president of Stern, agreed that IBP would cease shipments to Western Meat and sell high-grade beef to Stern, which would then resell it at a premium to the plaintiff.

Staiman attested that, during his meeting with IBP officials, Mostek told him, "I made a deal for you, you are [going to get] the same meat, you pay 2 cents more, [Wartell's] going to give you the same credit like [sic] Iowa Beef." Staiman Aff't, ¶ 11. Mostek and Connell further allegedly said: "You're going to get all the meat, number 1 and number 2 meat, as much as you want through Arthur Stern and you pay him 2 cents [more] a pound." *Id.*, ¶ 12. When he challenged this arrangement, Stai-

man allegedly was told, "Joe, don't waste your time. The deal is made[.]" *Id.*, ¶ 10.

IBP denies that it conspired to force Western Meat to purchase beef at two cents more per pound from Stern. Kane Reply Aff't, ¶ 9. Stern adopts IBP's statement of facts and law.[1] *See* Luks Aff't, ¶ 2. It adds that, although it was unable to buy as much lean beef as it wanted from IBP in 1984, it nonetheless agreed to "accommodate" Western Meat by selling part of its IBP shipments to the plaintiff. Both defendants deny that their actions toward Western Meat were malicious or unlawful. *See* Kane Aff't, ¶ 12; Luks Aff't, ¶¶ 3–7; Luks Reply Aff't, ¶ 2.

*Discussion*

In this action, Western Meat alleges that IBP and Stern are liable in prima facie tort for maliciously conspiring to fix prices and deprive it of its meat supply; that Stern tortiously interfered with Western Meat's business relations with IBP; and that both defendants tortiously interfered with the plaintiff's business relations with its customers.[2] *See* Plaintiff's Mem. at 3–4; Staiman Aff't, ¶ 5.

Since *Board of Educ. v. Farmingdale Classroom Teachers Ass'n, Inc.*, 38 N.Y.2d 397, 380 N.Y.S.2d 635, 644–645, 343 N.E.2d 278 (1975), it has been permissible under New York law to plead traditional tort and prima facie tort in the alternative, even where, as here, the claims rest upon a single set of allegations.[3] *See Nat'l Nutri-*

---

**1.** In doing so, it has explicitly adopted IBP's statement of undisputed facts pursuant to Rule 3(g), Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. *See* Luks Letter to Court, July 7, 1987, ¶ 4; Luks Aff't, ¶¶ 1, 2. Thus, contrary to the plaintiff's contention, Stern has not failed to comply with Local Rule 3(g).

**2.** At various times, the plaintiff has alleged malicious conspiracy, fraud, breach of contract, prima facie tort, and tortious interference with business relations. *See* Complaint, ¶ 6; Staiman Aff't, ¶¶ 4, 5; Plaintiff's Mem. at 3–4. The plaintiff dropped its fraud and breach-of-contract claims. *See* Plaintiff's Mem. at 3. Its malicious conspiracy claim appears to be asserted in prima facie tort. Therefore, only two

claims need be addressed upon these motions: tortious interference and prima facie tort.

**3.** That has not always been the case. *See, e.g., Susskind v. Ipco Hospital Supply Corp.*, 49 A.D. 2d 915, 373 N.Y.S.2d 627, 629 (2d Dep't 1975) (prima facie tort may not be alleged "when the basic allegations ... are the grounds for causes of action in 'traditional tort' "); *Holt v. Columbia Broadcasting System, Inc.*, 22 A.D.2d 791, 253 N.Y.S.2d 1020, 1023 (2d Dep't 1964) (same); *Metromedia, Inc. v. Mandel*, 21 A.D.2d 219, 249 N.Y.S.2d 806, 809 (1st Dep't), *aff'd*, 15 N.Y.2d 616, 255 N.Y.S.2d 660, 203 N.E.2d 914 (1964) ("where specific acts, recognized as tortious in the law, are asserted, the remedies lie only in the classic categories of tort" (quoting *Ruza v. Ruza*, 1 A.D.2d 669, 146 N.Y.S.2d 808, 810–811 (1st Dep't 1955)). *Cf. Nat'l Nutritional Foods*

*tional Foods Ass'n v. Whelan,* 492 F.Supp. 374, 383 (S.D.N.Y.1980) (Sofaer, J.). In *Farmingdale,* the New York Court of Appeals recognized that "there may be instances where the traditional tort cause of action will fail and plaintiff should be permitted to assert [the] alternative claim." *Id.* The contrary rule would be inconsistent with modern procedure and should not be "blindly applied." *Belsky v. Lowenthal,* 62 A.D.2d 319, 405 N.Y.S.2d 62, 65 (1st Dep't 1978), *aff'd,* 47 N.Y.2d 820, 418 N.Y. S.2d 573, 392 N.E.2d 560 (1979).

To prevent double recoveries, the court added that "once a traditional tort has been established[,] the allegation with respect to prima facie tort [is] rendered academic" and cannot be grounds for recovery. *Id.* At the pleading stage, the plaintiff is entitled to have both theories of recovery proceed in tandem.

*Tortious Interference Claim*

■ To prove tortious interference, Western Meat must establish that the defendants interfered with its business relations with third parties, and that they did so *"either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair, or in any other way improper.' "[4] *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y. 1983) (Goettel, J.) (citation omitted); *see NRT Metals, Inc. v. Laribee Wire, Inc.,* 102 A.D.2d 705, 476 N.Y.S.2d 335, 338 (1st Dep't 1984) (proof of malice or unlawful means is essential in an action for interference with at-will business relationships); *Rosenberg v. Del–Mar Div., Champion Int'l Corp.,* 56 A.D.2d 576, 391 N.Y.S.2d 452, 453 (2d Dep't 1977) (interference with business relations is not generally actionable unless unlawful means were used or the actor's sole motive was to injure the plaintiff); *Cosmopolitan Film Distribs., Inc. v. Feucht–Wanger Corp.,* 226 N.Y.S.

2d 584, 591 (Sup.Ct.1962) ("[i]nterference with an at will agreement may be actionable if accomplished by means which are themselves tortious or if motivated solely by malice").

At the summary judgment stage, the plaintiff must establish a genuine triable issue with respect to each of these elements. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Republic Nat'l Bank of New York v. Eastern Airlines, Inc.,* 815 F.2d 232 (2d Cir.1987). Mere "metaphysical doubt as to the material facts" does not suffice. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The inquiry must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

IBP and Stern argue that the plaintiff has established neither that it had business relations with third parties nor that the defendants' actions were motivated by malice.[5] In support of their first argument, the defendants point to Staiman's testimony that there is no such thing as an oral or written contract in the meat business. Kane Reply Aff't, ¶¶ 18–21. "Today you buy from me, tomorrow you buy from another guy. You don't want to buy, go buy from somebody else." *Id.* "There could have been no interference ... with plaintiff's business relations," they conclude, "since no continuing relations [between plaintiff and a third party] existed." *Id.*

The defendants' argument is tantamount to a claim that all at-will business relationships are incapable of suffering tortious

---

*Ass'n v. Whelan,* 492 F.Supp. 374, 384 (S.D.N.Y. 1980) (Sofaer, J.) (alternative pleading must be permitted only when the traditional tort claim appears meritorious).

**4.** The plaintiff's evidence concerns primarily malice, not unlawful or improper conduct. There is one allegation of unlawful or improper conduct: conspiracy to fix prices. *See* Com-

plaint, ¶ 6. But the evidence is insufficient to raise a genuine triable issue as to that allegation. *See infra* note 9.

**5.** The defendants apparently do not refute that, if there were continuing business relations between the plaintiff and third parties, the defendants' alleged acts interfered with those relations.

interference. The law is clear, however, that interference with a voidable contract or an at-will arrangement is actionable if the interference was motivated by malice or was accomplished by tortious means. *Cosmopolitan Film Distributors, Inc. v. Feucht–Wanger Corp.*, 226 N.Y.S.2d at 591; *see Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 634, 406 N.E.2d 445, 450 (1980) (no liability for interference with a voidable contract absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive); *Koeppel v. Schroder*, 122 A.D.2d 780, 505 N.Y.S.2d 666, 669 (2d Dep't 1986) (tortious interference with a contract terminable at will requires proof of wrongful interference such as fraudulent representations or threats).

Western Meat has satisfactorily shown that it had recurring business relations with third parties. Staiman testified that he had been selling to one particular butcher for "twenty some odd years," Staiman Deposition at 33; that he sold beef to a pool of hundreds of butchers, *id.* at 40; and that he specialized in serving "Spanish and Italian trade" customers who demanded very lean beef. *Id.* at 55–57. The defendants concede that Western Meat had a particular clientele and "catered ... to the Spanish and Italian trade." Kane Aff't, ¶ 5. They therefore cannot be heard to deny that Western Meat had ongoing business relations with third parties.[6]

With respect to the element of malice, the plaintiff's proof is less than sufficient. Malice consists of a motivation to injure the plaintiff. *See Rosenberg v. Del–Mar Div., Champion Int'l Corp.*, 391 N.Y.S.2d at 453; *Cosmopolitan Film Distribs., Inc. v. Feucht–Wanger Corp.*, 226 N.Y.S.2d at 591. The plaintiff relies upon a series of alleged events from which it argues that malice may reasonably be inferred: IBP (1) unjustifiably stopped selling beef to the plaintiff in July, 1984; (2) informed Staiman that it had no high-grade beef to sell, then

sold such beef to Stern; and (3) told Staiman in October, 1984 to begin purchasing his beef from Stern at a mark-up. The evidence offered in support of these allegations does not permit an inference of malice.

IBP has shown that it had legitimate business reasons for terminating its relationship with Western Meat. Those reasons—the "unavailability of the lean, heavy carcasses required by plaintiff; IBP's increased needs for carcasses to be processed as boxed meat in its own plants; reduced IBP kills; and frequent credit problems with plaintiff's account," *see* Kane Reply Aff't, ¶ 13—are well grounded in the testimony of Connell, Mostek, and Wartell, and are further documented by Layhee's letter to Staiman. Kane Aff't, ¶¶ 12–17; Kane Reply Aff't, ¶¶ 13–16. The plaintiff does not refute these proferred business reasons.

Furthermore, the plaintiff does not dispute that some of its checks to IBP were returned for lack of sufficient funds. *See* Plaintiff's Rule 3(g) Statement, ¶ 5. The plaintiff argues that "IBP suffered no financial damage as a result ... [because] plaintiff had provided collateral in the form of personal guarantees and a mortgage on Florida land at IBP's request." *Id.* This argument misses the mark. Mostek testified that at least twice during 1984, and perhaps another six to eight times in years prior to that, Western Meat failed to make timely payments. Kane Aff't, ¶ 17. On occasion, IBP was forced to delay shipments until payment was received. Such delays interfered with IBP's shipments to other customers. "When we would hold a shipment in a part load sale, it meant another customer suffered as well and it created internal problems with regard to customer service." *Id.* Thus, even accepting the plaintiff's assertion as true, it is unrebutted that IBP suffered recurring internal problems because of the plaintiff's undis-

---

**6.** This evidence, of course, addresses only the claim that both defendants interfered with relations between the plaintiff and its customers. It does not address the separate claim that Stern interfered with relations between IBP and Western Meat. As to that claim, the record is devoid of proof. *See infra* note 7.

puted financial delinquency.[7]

The plaintiff argues that malice may nonetheless be inferred from the fact that IBP continued shipping high-grade beef to Stern after having cut off the plaintiff's shipments. This argument misconstrues IBP's position. It appears that IBP supplied high-grade beef, in lessened amounts, to some of its customers throughout 1984, *see* Luks Aff't, ¶ 7, but IBP claims that this situation resulted from a decision to "phaseout" some of its customers because of the declining availability of certain cattle. Kane Aff't, ¶ 16. *According to Connell*, the plaintiff "just happened to be one of the first ones in there." *Id.* The plaintiff does not explicitly refute this explanation.

The only remaining proof of malice is Staiman's testimony that Mostek told him at the October, 1984, meeting that a "deal" had been made and that he was to buy his beef from Stern at two cents more per pound. Staiman Deposition at 147. IBP concedes that the topic of an alternative supplier came up at the meeting: "[I]n trying to help Mr. Staiman in his business[,] it was suggested to him that . . . he could . . . go to other suppliers and get the product or . . . [go to] other wholesalers." Kane Reply Aff't, ¶ 10. IBP denies that any IBP official specifically mentioned Stern or the price that he might charge.

The plaintiff is entitled to have its account of the meeting accepted as true. *See Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2509–11. Even if Mostek made the alleged statement, however, the plaintiff has failed to provide a factual context in which such a statement might be reasonably understood as malicious.[8] Western Meat has given no hint of proof that IBP believed

that its proposed "deal" would injure the plaintiff, that it offered the "deal" for that purpose, or that the terms of the "deal" were more disadvantageous to the plaintiff than those it might have negotiated on its own behalf.

Nor has the plaintiff established that Stern, which concedes that it sold high-grade beef to the plaintiff, was motivated by anything other than a competitive desire to make profit and to attract the plaintiff's customers. *See* Luks Aff't, ¶ 4. At most, the evidence shows that Stern negotiated a business deal with Western Meat under which Stern was to profit from the plaintiff's ruptured relations with its supplier. Such conduct alone does not exceed the bounds of lawful competition.

The law indulges the competitive behavior of defendants such as Stern. A competitor is not liable for interfering with the performance of the plaintiff's voidable contract with its supplier "absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive." *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 428 N.Y.S.2d at 634, 406 N.E. 2d at 450. This standard reflects the judgment that, in the interest of promoting competition, liability should be imposed upon a competitor only upon proof of "more culpable conduct." *Id.* at 633, 406 N.E.2d at 449. None has been adequately shown. *See id.* at 632, 406 N.E.2d at 449 ("wrongful means" defined as physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure). Therefore, as to both Stern and IBP, the plaintiff has failed to establish a triable issue concerning malice.[9]

---

**7.** There is no evidence that Stern participated in or influenced IBP's decision to terminate shipments to Western Meat. IBP has established that it terminated such shipments for internal business reasons. The tortious interference claim against Stern therefore cannot survive the instant motions.

**8.** An underlying deficiency in the plaintiff's proof is its failure to indicate why IBP would participate in a scheme to drive Western Meat out of business. *Cf. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 106 S.Ct. at

1356 (if the claim "simply makes no economic sense[,] [the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary).

**9.** Nor has the plaintiff established a triable issue concerning unlawful or improper conduct. The record shows merely that the defendants discussed an arrangement under which Stern would supply beef to the plaintiff at two cents more per pound. Under New York law, there is no substantive tort of civil conspiracy. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d

In reaching this conclusion, the court is "mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). The rule permitting summary judgment "would be rendered sterile, however, if the mere incantation of intent or state of mind [were to] operate as a talisman to defeat an otherwise valid motion." *Id.* The plaintiff may not "make a secret of his evidence until the trial [without risking] the possibility that there will be no trial." *Id.* On its claim of tortious interference, Western Meat has not managed to discharge its burden of designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 106 S.Ct. at 2553.

*Prima Facie Tort*

Western Meat also alleges that the defendants are liable in prima facie tort for maliciously conspiring to deprive it of its beef supply and drive it out of business.

The concept of prima facie tort "is rooted in the wise notion that no system of law can completely describe all claims deserving relief." *Nat'l Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. at 382. Thus, intentional misconduct that cannot necessarily be categorized as a traditional tort may fall under the rubric of prima facie tort. *Id.; Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984).

The claim requires proof of four elements: "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi,* 480 N.Y.S.2d at 469, 469 N.E.2d at 1327; *see El Greco Leather Products Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1045 (E.D.N.Y.1985). IBP and Stern contend that Western Meat has failed to raise a genuine issue of fact concerning special damages and malicious intent.

■ A plaintiff suing in prima facie tort must allege special damages and describe them with particularity. *Sbrocco v. Pacific Fruit, Inc.,* 565 F.Supp. 15, 16–17 (S.D.N.Y.1983) (Sweet, J.). A proper demonstration of special damages "requires a 'particularized statement of the reasonably identifiable and reasonable losses suffered.'" *Shaitelman v. Phoenix Mut. Life Ins. Co.,* 517 F.Supp. 21, 25 (S.D.N.Y.1980) (Pierce, J.) (quoting *Skouras v. Brut Prods., Inc.,* 45 A.D.2d 646, 648, 360 N.Y.S.2d 811, 813 (1st Dep't 1974)). The plaintiff's allegations fall far short of this standard.

Western Meat has not clearly stated the amount of damages that it seeks. The complaint requests $1 million in damages for alleged business losses, damage to the plaintiff's reputation, and overcharges for meat purchased by the plaintiff. Complaint, ¶ 11. In a subsequent affidavit, the plaintiff appears to seek over $2.5 million.[10]

---

Cir.1981); *Powell v. Kopman,* 511 F.Supp. 700, 704 (S.D.N.Y.1981) (Lasker, J.). "The damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt [tortious or unlawful] acts." *Grove Press, Inc. v. Angleton,* 649 F.2d at 123.

There is insufficient evidence to support an inference of price-fixing. A price-fixing agreement is "a combination formed for the purpose of and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). The plaintiff has not alleged or shown that the defendants intended to and did "raise[ ], lower[ ], or stabilize[ ] prices [and] directly interfer[e] with the free play of market forces." *Id.,* 60 S.Ct. at 843. Even if Stern charged two cents more per pound, such a price

differential would not indicate price-fixing. The price charged by a supplier is not necessarily comparable to that charged by a wholesaler. Moreover, there is no allegation or proof that Stern's price was one that a reasonable wholesaler would not have charged outside of the constraints of a price-fixing scheme.

**10.** According to its corporate income tax returns, *see* Staiman Aff't, ¶¶ 20–21, and Exh. 2, Western Meat's gross receipts for 1982, 1983, and 1984 were $2,678,770, $2,569,458, and $1,722,386, respectively. Gross receipts fell by $847,072 between 1983 and 1984, the year in which IBP made its last shipment. From this fact, the plaintiff argues that IBP's failure to deliver meat to the plaintiff after July 30, 1984, resulted in business losses of approximately $850,000 per year from 1985 through 1987, for a total of over $2.5 million.

Staiman Aff't, ¶ 21. Such wildly fluctuating figures necessarily defy the particularity requirement.

Moreover, Western Meat has made no attempt to itemize its alleged loss of good will, and it concedes that it cannot specify the amount by which it was allegedly overcharged by Stern. The complaint alleges that "the value of the plaintiff's business was greatly impaired and in effect, plaintiff was driven from its business and forced to sustain and suffer a great loss of profits and good will and has been damaged in the sum of $1,000,000.00." Complaint, ¶ 11. As a matter of New York law, "damages pleaded in such round sums, without any attempt at itemization, must be deemed allegations of general damages." *Leather Dev. Corp. v. Dun & Bradstreet, Inc.*, 15 A.D.2d 761, 224 N.Y.S.2d 513 (1st Dep't 1962) (per curiam), *aff'd*, 12 N.Y.2d 909, 237 N.Y.S.2d 1007, 188 N.E.2d 270 (1963).

With respect to its alleged business losses, the plaintiff has provided a flawed itemization.[11] *See* Staiman Aff't, ¶¶ 20–21. Its calculation of damages is based on the erroneous assumption that the defendants may be held liable for the plaintiff's forgone gross receipts, not merely its forgone profits. Special damages, however, are intended to compensate only for *actual* losses. *Lincoln First Bank of Rochester v. Siegel*, 60 A.D.2d 270, 400 N.Y.S.2d 627, 633 (4th Dep't 1977). By failing to delineate its actual losses, Western Meat has necessarily failed to link its purported losses to the defendants' alleged deeds. *Id.* ("[s]pecial damages must be ... related casually [sic] to the alleged tortious act"). These deficiencies alone provide grounds for summary judgment against the plaintiff on this claim.

The plaintiff has also failed to establish that the "[d]efendant's conduct [was] prompted by a malicious motive unmixed with any other and [was] exclusively directed to injure and damage [the plaintiff]." *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 554 F.Supp. 838, 849 (S.D.N.Y. 1982) (Sand, J.), *aff'd*, 724 F.2d 290 (2d Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *cf. Curiano v. Suozzi*, 480 N.Y.S.2d at 469, 469 N.E.2d at 1327 (sole motivation for the alleged misconduct must have been "disinterested malevolence"). "Where there are other motives, *e.g.*, profit, self-interest, business advantage, there is no recovery under tort prima facie." *Strapex Corp. v. Metaverpa N.V.*, 607 F.Supp. 1047, 1052 (S.D.N.Y.1985) (Sweet, J.) (quoting *Squire Records, Inc. v. Vanguard Recording Soc'y, Inc.*, 25 A.D.2d 190, 191–92, 268 N.Y.S.2d 251 (1st Dep't 1966)), *aff'd*, 19 N.Y.2d 797, 279 N.Y.S.2d 737, 226 N.E.2d 542 (1967). Such motives apparently existed, as the unrebutted evidence shows.

### Conclusion

The law is clear that upon a summary judgment motion all allegations of fact must be viewed, *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2513; *Herrmann v. Steinberg*, 812 F.2d 63, 65 (2d Cir.1987), and all reasonable inferences drawn, *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2509–11; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), in favor of the nonmoving party. Even so, Western Meat has established no more than mere suspicion on its part that the defendants are to blame for its failed business. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and entitles the moving party to judgment as a matter of law. *Celotex Corp. v. Catrett*, 106 S.Ct. at 2553. Therefore, the defendants are entitled to summary judgment on both claims, and the complaint is dismissed.

IT IS SO ORDERED.

---

The plaintiff's counsel later reduced that figure, without explanation or documentation, to $255,000. *See* Karp Letter to Court, Aug. 4, 1987, ¶ 2.

**11.** *See supra* note 10.