**LITTON INDUSTRIES, INC., Plaintiff,**

**v.**

**LEHMAN BROTHERS KUHN LOEB INCORPORATED, Dennis Levine, Ira B. Sokolow, Robert M. Wilkis, Bank Leu International, Ltd., Bank Leu A.G., Bernhard Meier, John R. Lademann, Bruno Pletscher, Jean–Pierre Fraysse, Christian Schlatter, John Doe, Jane Doe and John Doe, Inc., Defendants.**

No. 86 Civ. 6447 (JMC).

United States District Court,
S.D. New York.

March 27, 1989.

Myerson Kuhn & Sterrett, Washington, D.C. by Harvey A. Levin and Michael I. Smith, for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C. by Henry A. Hubschman, David M. Miles and David B. Hardison, for defendants, Bank Leu A.G., Leu Trust and Banking (Bahamas) Ltd., John R. Lademann, Bruno Pletscher and Christian Schlatter.

Willkie Farr & Gallagher, New York City by Anthony F. Phillips, Jeanne M. Luboja, Jonathan P. Wolfert and Ziporah Janowski, for defendant, Lehman Bros. Kuhn Loeb Inc.

Ashinoff, Ross & Goldman, New York City by Michael H. Barr, for defendant, Robert Wilkis.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Brad S. Karp, for defendant, Dennis Levine.

Weisberg & Berns, New York City by David E. Weisberg, for defendant, Jean-Pierre Fraysse.

Curtis, Mallet-Prevost, Colt & Mosle, New York City by Eliot Lauer, for defendant, Ira B. Sokolow.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Defendants' motion for partial summary judgment is granted. Fed.R.Civ.P. 56(d).

## BACKGROUND

Plaintiff Litton Industries, Inc. ["Litton"] is a Delaware corporation engaged in the business of defense electronics. Prior to 1983, Itek was a Delaware corporation engaged in the business of electronic warfare, a sub-specialty of the defense electronics industry. At all times prior to 1983, shares of Itek common stock were publicly traded in the securities markets.

Prior to September 1982, Litton began searching for a company engaged in the manufacture and sale of electronic weapons systems as a potential candidate for acquisition by Litton. In September 1982, Litton retained Lehman Brothers Kuhn Loeb, Inc. (now known as Shearson Lehman Brothers) ["Lehman"], at that time a prominent investment banker known for its expertise in the defense industry, to advise it in connection with Litton's possible acquisition of one or more companies engaged in the defense electronics industry. Lehman's recommendation, delivered shortly after being hired, was that Litton should purchase, on the open market, 4.9% of a target company's common stock and then attempt a friendly takeover. Itek was one of several companies highlighted in Lehman's presentation as a potential candidate for acquisition. Thereafter, Litton decided to invest in Itek and between October 15 and November 2, 1982, Litton purchased

131,600 shares of Itek common stock in open market transactions. In November 1982, Litton decided to attempt to acquire Itek and retained Lehman to serve as its investment banker for the transaction.

Litton was determined that any takeover of Itek was to be a friendly one and negotiations between the two companies began in late November 1982. Negotiations were conducted by Fred O'Green, Chairman of Litton and Robert Henderson, Chairman of Itek. In early January 1983, the Executive Committee of Litton's Board of Directors authorized O'Green to provide Henderson with a letter offering $42.50 per share. O'Green, however, did not convey this offer to Henderson as he believed that Henderson had already indicated that such an offer would be unacceptable to the Itek Board of Directors [the "Itek Board" or the "Board"]. On January 10, 1983, Litton presented its first formal offer, of $46 per share, to the Itek Board.

The Itek Board convened on January 12, 1983 to consider Litton's offer. While the Itek Board did not vote to recommend shareholder rejection of the offer, it did, however, determine that $46 per share was an inadequate price. Henderson, therefore, was directed to attempt to persuade Litton to raise the price per share. Thereafter, Litton communicated an offer of $48 per share to the Itek Board. The Itek Board convened on January 13, 1983, to consider this new offer. At that board meeting, The First Boston Corporation ["First Boston"], Itek's investment banker, issued an oral and documentary report which stated that the $48 per share offer was fair. At this time, the Itek Board voted unanimously to recommend the $48 per share offer to its shareholders. Litton publicly announced the upcoming tender offer and the Itek Board sent a letter to all holders of Itek common stock and convertible debentures recommending that they tender their shares.

The tender offer was commenced on January 17, 1983, and successfully concluded by March 4, 1983. Itek was then merged into a wholly owned subsidiary of Litton. Any outstanding shares of Itek common stock were converted into a right to receive $48 per share.

It is undisputed that during the time of the negotiations and subsequent tender offer for Itek, Dennis Levine was employed by Lehman. It is also undisputed that Levine conducted massive amounts of trading based on material nonpublic information ["insider trading"] during this period. Levine's insider trading was apparently conducted with the knowledge, assistance and participation of defendants Bank Leu, A.G. ["BLZ"], a Swiss corporation; Bank Leu International Ltd. (now known as Leu Trust and Banking (Bahamas) Limited) ["BLI"], a Bahamian corporation and wholly owned subsidiary of BLZ; Jean–Pierre Fraysse, BLI's managing director and board member; John R. Lademann, BLI board member and member of the Management Board of BLZ; Bruno Pletscher, general manager of BLI; Christian Schlatter and Bernhard Meier, employees of BLI; and Ira Sokolow, an employee of Lehman.

It is also undisputed that defendants purchased an aggregate 60,000 shares of Itek common stock, in open market transactions, between November 12 and December 29, 1982. Although Litton is very satisfied with its takeover of Itek, it initiated the instant action claiming that, absent defendants' insider trading, Litton could have acquired Itek at a cheaper price. In fact, Litton alleges that absent defendants' insider trading it would have made the Board an offer of not more than $40 per share. Litton does not seek to undo the transaction, but rather, seeks damages based on the alleged artificially inflated price it paid for the shares of Itek common stock.

The complaint alleges causes of action under (1) section 10(b) of the Security Exchange Act of 1934, 15 U.S.C. § 78j(b) and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (count one); (2) section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) and rule 14e–3 promulgated thereunder, 17 C.F.R. § 240.14e–3 (count two); (3) The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.*, specifically, 18 U.S.C. §§ 1962(a), (b), (c) and (d) and 18 U.S.C. § 1964(c) (counts three, four, five

and six); (4) fraud (count seven); (5) negligence (count eight); (6) intentional interference with a business and contractual relationship (count nine); (7) breach of contract (count ten); (8) breach of fiduciary duty (count eleven); and (9) section 352–c of New York General Business Law (count twelve); (10) section 1609(b) of New York Business Corporation law (count thirteen).

Defendants seek summary judgment contending that plaintiff lacks standing to bring counts two, twelve and thirteen. In addition, defendants seek partial summary judgment on those portions of counts one, three, four, five, six, seven and nine which allege losses occurring from the purchases made during the tender offer on January 17, 1983, and through the purchases made during the Litton/Itek merger on March 4, 1983. Defendants contend that there is no material question of fact that their conduct did not cause Litton injury.[1]

## DISCUSSION

### 1. STANDARDS FOR THE APPLICATION OF SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court is not to resolve disputed issues of fact, but must "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The mere existence of disputed factual issues, however, is not enough to defeat a motion for summary judgment. *Knight*, 804 F.2d at 11–12; *Quarles v. General*

*Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). For the issues of fact to be "genuine," they must have a real basis in the record before the court, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and most significantly, must be "material to the outcome of the litigation." *Knight*, 804 F.2d at 11. It stands to reason that, in order to be material, the disputed issues must implicate cognizable legal principles upon which recovery may be had, or liability denied, thus entitling the moving party to judgment "as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson*, 477 U.S. at 248–52, 106 S.Ct. at 2510–12; *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988); *see also* S.A. Childress, *A New Era For Summary Judgments: Recent Shifts At The Supreme Court*, 116 F.R.D. 183, 189–90 (1987) (discussing *Anderson*).

In the procedural sense, the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This burden may be met by demonstrating the lack of any evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. When a moving party has carried his burden under Rule 56(c), his "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (footnote omitted). A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight*, 804 F.2d at 12, nor on a "bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be

---

1. Defendants are not moving for summary judgment on that portion of the complaint which

seeks damages based on Litton's purchases of Itek stock on the open market.

obtained only through discovery." *Eastway*, 762 F.2d at 251. In sum, where the court determines that "the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

## 2. FEDERAL CAUSES OF ACTION

### A. *Causation and Damages under Section 10b*

The Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a *et seq.* [the "Act"], was designed to "encourage public participation in the stock market by protecting investing members of the public from fraud and manipulation of stock prices," *Jaksich v. Thomson McKinnon Secur. Inc.*, 582 F.Supp. 485, 492 (S.D. N.Y.1984) (citing cases), and to promote ethical standards of honesty and fair dealing in every facet of the securities industry. *Id.* (citing cases). In accordance with these goals, section 10(b)[2] of the Act, 15 U.S.C. § 78j(b), and Rule 10b–5[3] promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, were designed to prohibit fraudulent, manipulative and deceptive schemes in connection with the purchase or sale of any security.

"In order to state a claim for relief under section 10b a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant, acting with scien-

ter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury."[4] *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985) (citations omitted); *see also Jaksich*, 582 F.Supp. at 493 (citing cases).

■■■ Defendants move for partial summary judgment claiming that Litton can not establish, as a matter of law, that defendants' insider trading harmed it by "direct[ly] and proximate[ly]" causing Litton "to pay substantially more for the securities of Itek ... than [it] would have paid absent [defendants'] illegal conduct." Second Amended Complaint, ¶¶ 32–35. Defendants contend that in order to succeed in its claim, Litton must establish that (1) the purchase of 60,000 shares by defendants did affect and artificially inflate the market price of Itek stock; (2) absent defendants' trading and its alleged effect on the market price of Itek stock, Litton would have acted differently and would have adjusted its offer to a price lower than $48 per share; and (3) had the illegal trading and its alleged market impact not occurred, the Itek Board and the Itek shareholders would have agreed to sell Itek to Litton for less than $48 per share.

Litton, on the other hand, argues that the "direct" and "proximate" language used in its complaint is standard rhetoric

**2.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— ...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**3.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**4.** A fifth element of a 10(b) action is that the defendants used "any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange." 15 U.S.C. § 78j(b); *see Jaksich*, 582 F.Supp. at 493. In the instant action, all the transactions at issue were executed on the New York Stock Exchange, thus, the fifth element is satisfied.

under section 10b and that it is not required to prove that it actually could have effected the transaction at a lower price, but only, (1) that the price of the security was artificially inflated by the fraud; (2) that Litton purchased the shares at an artificially inflated price; and (3) the amount of the artificial inflation. In other words, Litton is arguing that the question of whether the Itek Board would have approved a less than $48 per share price is irrelevant as Litton, not the Itek Board, is the defrauded party.

Litton relies principally on *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.1973), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), to support this argument.[5] In that action, Chris–Craft Industries, Inc. ["CCI"] commenced a cash tender offer for shares of Piper Aircraft Corporation ["Piper"]. Bangor Punta Corporation ["Bangor"] then entered into an agreement with Piper whereby Bangor agreed to use its best efforts to obtain a majority of the outstanding shares of Piper.

Bangor was ultimately successful in gaining majority control of Piper. Thereafter, CCI brought suit claiming that Piper and Bangor, through written communications containing material misrepresentations, induced Piper shareholders not to tender their shares to CCI.

The district court, finding that CCI had introduced no evidence that " 'a single exchanging Piper shareholder would have refrained from the [Bangor] exchange *and* taken an offer for his shares from Chris–Craft instead of that from Bangor Pun-

ta,' " entered judgment in favor of the defendants. *Chris–Craft*, 480 F.2d at 373 (quoting *Chris–Craft Indus. v. Piper Aircraft Corp.*, 337 F.Supp. 1128, 1131 (S.D.N.Y.1971)) (emphasis in original). The Second Circuit, holding that the district court had applied the wrong theory of causation, reversed the district court's decision. The Second Circuit found that because CCI's claim of injury depended "upon the exercise of volition by other persons," CCI need not show that it relied on defendants' misrepresentations, but rather, that "there was a misrepresentation [by the defendants] upon which the target corporation stockholders relied and that this was in fact the cause of CCI's injury." 480 F.2d at 373 (citing *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967)).

The Second Circuit noted that, in light of the "numerous shareholders [involved] who undoubtedly possess a wide range of expertise and knowledge," it would be unduly burdensome to require CCI to establish that each individual shareholder relied on defendants' misrepresentations. *Chris–Craft*, 480 F.2d at 375. The Second Circuit, therefore, determined that it would be reasonable to presume that "the Piper shareholders would not have accepted the Bangor exchange offer but for the misrepresentations [of the defendants]." *Id.* Finding no evidence in the record to rebut the presumption, the Second Circuit declared that "[r]eliance and causation have been shown." *Id.*

Litton, however, is not entitled to the same presumption.[6] The instant action

---

**5.** The Supreme Court reversed the Second Circuit decision holding that tender offerors do not have standing to allege violations of section 14(e) of the Act as they are not among the class of people the statute was designed to protect. *See Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

**6.** The other cases cited by plaintiff are not controlling as the courts in those cases used the "fraud on the market" theory to invoke a presumption of reliance and causation in favor of the plaintiff. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Flamm v. Eberstadt*, 814 F.2d 1169

(7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *In re Warner Communications Sec. Litigation*, 618 F.Supp. 735 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir.1986); *In re Memorex Sec. Cases*, 61 F.R.D. 88 (N.D.Cal.1973).

does not involve large numbers of individual shareholders, but rather, the issues of reliance and causation may be addressed by examining the nature of the transaction engaged in by the parties and the basis for the decision of the Itek Board to approve Litton's offer of $48 per share.

The record is clear that Litton was seeking a "friendly" takeover of Itek. Price negotiations were conducted in face to face meetings with Itek and Litton. Joseph T. Casey, Executive Vice–President, Chief Financial Officer and member of the Executive Committee and Board of Directors of Litton, testified at his deposition that Litton was seeking an all cash merger with unanimous approval of the Itek Board. *See* Deposition of Joseph T. Casey, at 149, 86 Civ. 6447 (JMC) (S.D.N.Y. Aug. 4, 1987) ["Casey Dep."]. Henderson testified that O'Green, at their initial meeting to discuss Litton's acquisition of Itek, assured him

that under no circumstances would Litton commence a hostile takeover. *See* Deposition of Robert Henderson, at 61, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 28, 1987) ["Henderson Dep."]. In addition, Litton negotiated with Itek for a "no shop" commitment and a "lock-up" option on 18 and ½% of Itek common stock. Casey Dep. at 149, 176, 403 and 407.[7] As with the merger agreement, both a "no shop" commitment and a "lock-up" option are contracts that may be entered into only by a corporation's board of directors. *See generally Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264 (2d Cir. 1986); *Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757 (2d Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983). Casey's statement that O'Green had informed the Litton Board that it should be prepared to rethink their strategy in the event that a friendly merger could not be consummated fails to create a

Under the fraud on the market theory a purchaser of stock on the open market who claims injury from a defendant's misrepresentations or omissions need not establish subjective reliance on the misrepresentations or omissions. *See Blackie,* 524 F.2d at 906. "Causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance." *Id.*

The presumption of reliance, however, "is essentially a rule of judicial economy and convenience designed to avoid the impracticality of requiring that each plaintiff shareholder testify concerning the reliance element." *Panter v. Marshall Field & Co.,* 646 F.2d 271, 284 (7th Cir.1981). As noted by the Court of Appeals for the Ninth Circuit

[Courts] eliminate the requirement that plaintiffs prove reliance directly ... because the requirement imposes an unreasonable and irrelevant evidentiary burden. A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price —whether he is aware of it or not, the price he pays reflects material misrepresentations.

*Blackie,* 524 F.2d at 907. However, reliance may be presumed only "where it is logical" to do so. *Osofsky v. J. Ray McDermott & Co.,* 725 F.2d 1057 (2d Cir.1984) (citing cases).

In the instant action, Litton, the sole purchaser, did not purchase Itek stock on the open market, but rather, personally negotiated the transaction. Thus, under the facts of this case it is not logical to presume reliance and causation.

Equally unavailing to Litton are the remainder of the cases cited. *See Alna Capital Assoc. v. Wagner,* 758 F.2d 562 (11th Cir.1985); *Rowe v. Maremont Corp.,* 650 F.Supp. 1091 (N.D.Ill. 1986), *aff'd,* 850 F.2d 1226 (7th Cir.1988); *Quintel Corp. v. Citibank,* 596 F.Supp. 797 (S.D.N.Y. 1984). While it is true that those cases have held that a defrauded purchaser under 10b–5 is entitled to his out of pocket losses, they did not, contrary to Litton's assertion, eliminate reliance as a necessary element of a 10b–5 cause of action. *See Alna Capital,* 758 F.2d at 566 (rule 10b–5 requires prove of misrepresentation upon which purchaser relied and proximately caused injury); *Rowe,* 650 F.Supp. at 1105 ("plaintiffs must prove reliance on the allegedly misleading statements"); *Quintel,* 596 F.Supp. at 802 (sophistication of plaintiff is relevant in determining extent of reliance on misrepresentation).

7. The purpose of the "no shop" commitment was to prevent the Itek Board from seeking competing bids while, a "lock-up [option] is any device ... designed to increase the likelihood of the successful acquisition of a target by one particular bidder and to discourage, impede or prevent competing offers by other potential bidders, through means other than price competition or litigation." Lowenstein, *Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation,* 83 Colum.L.Rev. 249, 254 n. 29 (1983).

material question of fact as to whether Litton would have commenced a hostile takeover if friendly negotiations failed. *See* Casey Dep. at 128.

Thus, the question of whether the deal was a hostile or nonhostile tender offer is not, as Litton argues, a red herring, but rather, a necessary element to understanding the nature of the transaction. That Litton was committed to a friendly merger negates the inference that the price Litton was willing to pay for Itek would be determined solely on the basis of the market price plus a premium. Litton wanted and indeed needed the Itek Board's approval to consummate the deal. In fact, when the Itek Board informally rejected Litton's offer of $46 per share, Litton immediately countered with an offer of $48 per share. It is, therefore, insufficient to claim, as Litton does, that because it relied on the market price, it has established causation.

The record before the Court is devoid of evidence from which a reasonable jury could conclude that, absent defendants' insider trading, the Itek Board would have approved an offer of not more than $40 per share. It is undisputed that the individual Itek directors were aware of the recent increases in the market price of Itek common stock, but did not consider it significant in determining whether to accept Litton's offer. *See* Deposition of Walter David Dance, at 15 and 18, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 26, 1987) ["Dance Dep."] ("Itek stock bounced around like a rubber ball." "The company was worth a lot more than it currently was valued in the marketplace."); Henderson Dep. at 26 and 72 ("Itek stock fluctuated rapidly and had over the past few years"); Deposition of Salvatore Macera, at 14, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 23, 1987) ["Macera Dep."] (historical trading pattern of Itek characterized as volatile, market price did not reflect value of Itek). The record clearly establishes that the company's inherent value formed the basis for the Itek Board's decision, not the market price of Itek common stock. *See* Macera Dep. at 12–17 and 27; Dance Dep. at 14–16; Henderson Dep. at 26–28 and 34–35; Declaration of Daniel Anderson, at ¶¶ 4, 6 and 8, 86 Civ. 6447 (JMC) (S.D.N.Y. Dec. 2, 1987) ["Anderson Dec."]; Declaration of Peter Crisp, at ¶¶ 4–5, 86 Civ. 6447 (JMC) (S.D.N.Y. Dec. 23, 1987) ["Crisp Dec."]; Declaration of Maurice Lazarus, at 4–5, 86 Civ. 6447 (JMC) (S.D.N.Y. Dec. 18, 1987) ["Lazarus Dec."]; Declaration of Franklin A. Lindsay, at ¶ 5, 86 Civ. 6447 (JMC) (S.D.N.Y. Dec. 16, 1987) ["Lindsay Dec."].

Litton, however, argues that the Itek Board could not have relied on Itek's inherent value in assessing Litton's offer because inherent value "has no meaning and cannot be ascertained." Memorandum in Opposition to Motion for Partial Summary Judgment, at 36 n. 26., 86 Civ. 6447 (JMC) (S.D.N.Y. Feb. 16, 1988) ["Opposition"]. This argument is without merit. Contrary to Litton's assertion, inherent value is a concept used by courts, commentators and securities analysts in valuing a corporate enterprise. One commentator has defined it as "the price that a private buyer would pay if, in a freely negotiated transaction, with access to all material information, he were buying the enterprise as a whole." Lowenstein, *Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation*, 83 Colum.L.Rev. 249, 275 (1983). That commentator further stated that "[i]ntrinsic value may be based on book or liquidation value of the underlying properties, but it need not be. It may be based on earning power, or a discounted cash flow that will, in one form or another, offer to the buyer a market return on his investment." *Id.* Efficient market theorists, on the other hand, have defined intrinsic value as "the value shares would have in trading transactions in the stock market when all available information about the company that is available to anyone in the market is available to all." *Id.*

Moreover, the Delaware Supreme Court, in valuing a dissenting shareholder's appraisal rights, found that the "value of the stockholder's proportionate interest in the corporate enterprise is the true or intrinsic value of his stock...." *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.Sup.1983). The court then went on to state that to determine the intrinsic value

"courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or could be ascertained ... and which throw any light on *future prospects ... must be considered* by the agency fixing the value."

*Id.* at 713 (quoting *Tri–Continental Corp. v. Battye,* 74 A.2d 71, 72, 31 Del Ch. 523 (Del.Sup.1950) (emphasis in original)).

More importantly, directors of Delaware corporations have been found to have violated their fiduciary duties if they agree to recommend merger proposals without considering the company's inherent value. *See Smith v. Van Gorkom,* 488 A.2d 858, 875 (Del.Sup.1985) ("A substantial premium may provide one reason to recommend a merger, but in the absence of other sound valuation information, the fact of a premium alone does not provide an adequate basis upon which to assess the fairness of an offering price."). *Accord Hanson,* 781 F.2d at 276. Finally, directors who determine that "based upon their knowledge gathered from other reliable sources, [an] offer, even if at a premium over market price, [is] plainly inadequate in relation to company's intrinsic value" have not violated their fiduciary duties. *Lewis v. Honeywell, Inc.,* Fed.Sec.L.Rep. (CCH) 97,534 at p. 93,565, 1987 WL 14747 (Del.Ch.1987).

Thus, the concept of inherent or intrinsic value exists. Furthermore, the record establishes that the individual directors of the Itek Board not only understood the concept of inherent value, but used it in evaluating the fairness of Litton's offer. Henderson, in his initial discussions with O'Green regarding the possible acquisition of Itek by Litton, informed O'Green that management was engaged in the preparation of a strategic plan that it wanted to complete before it responded to Litton's inquiries. *See* Henderson Dep. at 62. The strategic plan was not prepared for the purpose of affixing a fair price for Itek, but rather, was something Henderson routinely prepared. *See* Macera Dep. at 43. More importantly, the strategic plan did not use the market price of Itek stock in calculating its future earning projections for the company. *See* Henderson Dep. at 30.

Moreover, Henderson, in explaining why he thought Litton's initial offer of $46 per share was fair, stated that "[he] had done the strategic plan, and [he] knew what the results would be three years out ... [and he] looked at what the results were three years out and the risk involved in getting there and ... it seemed ... to be a reasonable offer." Henderson Dep. at 118–19. Director Dance testified that his view of what Itek was worth was based on the "long-range plan which [Henderson] presented to [the Itek Board] and [Henderson's] figures as to what ... the company was worth, based on the earnings projections that [Henderson] had in the plans." Dance Dep. at 33–34. Finally, Director Macera testified that "the value of Itek Corporation had to be determined on factors outside the stock market." Macera Dep. at 14. Macera further testified that he evaluated Itek based on "a razor blade analysis where you dissect the company into its pieces and assign a value to each piece and add it up." Macera Dep. at 17.

On a motion for summary judgment, once the moving party has met its burden of proof, the nonmoving party bears the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Litton has not met this burden. Litton has failed to offer any evidence to establish that the directors used the market price of Itek stock to evaluate the fairness of Litton's offer. The testimony of Brian Young, First Boston's representative, merely establishes that he personally does not understand what is meant by the term inherent value. Deposition of Brian DeLissa Young, at 66, 86 Civ. 6447 (JMC) (S.D.N.Y. Jan. 28, 1988) ["Young Dep."]. The affidavits of both Henderson and John R. Potter, Vice–President, Secretary and General Counsel to Itek, merely state that they could not *remember* the Itek Board discussing Itek's inherent value at either the January 12th or 13th board meetings. *See*

Henderson Affidavit, at ¶ 9; Affidavit of John R. Potter, ¶ 8, 86 Civ. 6447 (JMC) (S.D.N.Y. Feb. 12, 1988) ["Potter Affidavit"]. This in no way refutes the evidence that the individual Itek directors evaluated Litton's offer based on their concept of Itek's inherent value and not the market price of Itek stock.

Equally unpersuasive is Litton's argument that because the Itek Board did not formally reject Litton's offer of $46 per share, absent defendants' insider trading, the Board would have agreed to recommend to its shareholders an offer of not more than $40 per share. Litton contends that the Board did not find the $46 per share offer unfair, but rather, it just wanted to see if it could get a better deal. Thus, Litton argues, the Board "intended to consider recommending $46 per share to [Itek] security holders if Litton had not increased the offer." Opposition at 66. The only evidence Litton offers in support of this proposition, however, is Henderson's statement that he believed $46 per share was fair and Macera's testimony that "[i]f Bob Henderson had come back and said $46 is a final price, there would have been another discussion." Macera Dep. at 73.

First, it is important to note that Henderson can not identify any other director who shared his view that $46 per share was a fair offer. See Henderson Dep. at 152. Second, Macera testified that he was not prepared to accept the $46 per share offer. See Macera Dep. at 24. Third, directors Anderson, Crisp, Lazarus and Lindsay have each sworn that they believed that Itek should not accept the $46 per share offer but should seek a higher price. See Anderson Dec. at ¶ 8; Crisp Dec. at ¶ 5; Lazarus Dec. at ¶ 5; Lindsay Dec. at ¶ 5. Finally, it was the general consensus of the Itek Board that $46 per share was an insufficient offer. See Mac-

era Dep. at 72–73; Dance Dep. at 17; Henderson Dep. at 152.

On a motion for summary judgment a "moving party's showing is heightened when the factual context renders the opposing party's claim implausible. In those circumstances, more persuasive evidence than would otherwise be necessary must be adduced to avoid summary judgment." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 684 F.Supp. 27, 30 (S.D.N.Y.1988), *aff'd*, 865 F.2d 492 (2d Cir.1989). Litton has failed to meet this burden. That the Itek Board may have reconsidered Litton's $46 per share offer, *see* Macera Dep. at 73; Henderson Affidavit at ¶ 8, does not establish that the Board would have accepted it. More importantly, the hypothetical reaction of the Board to a firm offer of $46 per share provides no basis whatsoever for a jury to conclude that, absent the defendants' insider trading, the Board would have accepted an offer of not more than $40 per share.[8]

Finally, Litton argues that because First Boston used a premium over market price analysis as part of its calculations in determining that $48 per share was a fair offer, First Boston, absent defendants' insider trading, would have opined that an offer of not more than $40 per share was fair. This argument, however, patently ignores the fact that First Boston was Itek's investment banker and financial advisor and, therefore, did not have any authority to bind the Board. *See Van Gorkom*, 488 A.2d at 876 (neither an outside valuation study, nor a fairness opinion by independent investment bankers is required to support an informed business judgment). There is nothing in the record to indicate that Itek would have agreed with First Boston and approved an offer of not more than $40 per share.

More importantly, Litton's argument overlooks the fact that the premium over market price analysis was just one of the

---

8. Because the Board's approval of the tender offer and merger was critical to its success and Litton has been unable to establish that the Board would have approved an offer of not more than $40 per share, conjecture as to whether the shareholders would have tendered

their shares for not more than $40 per share is irrelevant. *See Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del.Sup.1985) ("shareholders do not possess a contractual right to receive takeover bids").

factors used by First Boston in determining whether Litton's offer was fair. The fairness opinion itself states that, in addition to comparable premium over market price analysis, First Boston "reviewed certain publicly available business and financial information relating to Itek [and] certain other information provided to [First Boston] by Itek, including management's recently completed five year strategic plan." Exhibits to Litton's Memorandum, Exh. 28, 86 Civ. 6447 (JMC) (S.D.N.Y. Feb. 16, 1988) ["Litton's Exh."]. In addition, First Boston's report at the January 13th Board meeting indicates that First Boston analyzed Itek's earnings and book value as well as the earnings and book value of other comparable companies. *See* Litton's Exh. 19 at 000233–238. That First Boston's opinion of the $48 per share offer was based on several factors refutes the inference that First Boston would have disregarded those factors and opined that, based solely on a premium over market price analysis, an offer of not more than $40 per share was fair.

On this record, the Court can only conclude that no reasonable jury could find a causal connection between defendants' insider trading and the price Litton paid for Itek stock during the tender offer of January 17th and the Litton/Itek merger of March 4th. Summary judgment on these issues, therefore, is appropriate.

### B. *Private Right of Action under the Williams Act*

■ Section 14(e) of the Williams Act, 82 Stat. 457, as amended 15 U.S.C. § 78n(e), provides that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation....

Rule 14e–3 of the rules promulgated under the Security Exchange Act provides:

(a) If any person has taken a substantial step to commence, or has commenced, a tender offer ..., it shall constitute a fraudulent, deceptive or manipulative act or practice ... for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows has been acquired directly or indirectly from:

(1) The offering person, ... to purchase or sell or cause to be purchased or sold any of such securities....

The purpose of the Williams Act is to " 'insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.' " *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975)). To this end, section 14(e) requires persons making tender offers to make full disclosure of material information. *Schreiber,* 472 U.S. at 8–9, 105 S.Ct. at 2462–63.

Defendants move for summary judgment on this claim contending that a tender offeror does not have a private right of action under section 14(e).

The law is well established that a private right of action exists under section 14(e). *See Stull v. Bayard,* 561 F.2d 429, 432 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978). In addition, courts have determined that this right extends to a shareholder to whom a tender offer has been made regardless of whether the shareholder tenders his shares. *See Plaine v. McCabe,* 797 F.2d 713, 718 (9th Cir.1986); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 596 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 946 (2d Cir.1969); *Coronet Ins. Co. v. Seyfarth,* 665 F.Supp. 661, 668 n. 6 (N.D.Ill. 1987); *Horowitz v. Pownall,* 582 F.Supp.

665, 668 (D.Md.1984); *Bolton v. Gramlich,* 540 F.Supp. 822, 835 (S.D.N.Y.1982); *Wellman v. Dickinson,* 475 F.Supp. 783 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

The courts, however, have limited tender offerors to suits for injunctive relief only. *See, e.g., Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *Camelot Indus., Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174 (S.D.N.Y.1982). Indeed, the Supreme Court has expressly stated that tender offerors are not in the class of people the Williams Act was designed to protect and, therefore, tender offerors, acting in their capacity as tender offerors, do not have an implied right of action under section 14(e). *See Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1976). Moreover, courts, finding that any benefit derived from the suit would inure to them as tender offerors and not as shareholders, have refused to imply a private right of action for tender offerors based on their purchases of stock during the tender offer. *See id.* at 35–37.

Finally, plaintiff cites no authority, and indeed the Court can find none, authorizing the extension of section 14(e) to protect tender offerors who have allegedly been victimized by their own financial advisors. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth what it considered the reliable indicia of Congress' intent to create a private right of action where a statute does not expressly provide for one.

Initially, the Court must determine whether plaintiff is a member of the class of people for whose benefit the statute was enacted. *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087 (quoting *Texas & Pacific R.R. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)). As previously discussed, it is beyond dispute that the Williams Act was enacted to protect shareholders faced with a decision regarding a tender offer and not the tender offeror.

The second *Cort* factor is whether there is any indication that Congress intended to either create a remedy or deny one. 422 U.S. at 78, 95 S.Ct. at 2087 (citing *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974)). As noted by the Supreme Court, Congress' purpose in enacting the Williams Act "negates the claim that tender offerors were intended to have additional weapons in the form of an implied cause of action for damages." *Piper,* 430 U.S. at 38, 97 S.Ct. at 947.

The third *Cort* factor is whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted). In the instant action, reimbursing plaintiff would not benefit the protected class shareholders as it was the shareholders who benefited from the alleged increase in the stock.

Finally, the Court must decide if "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the [s]tates, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted). Breaches of fiduciary duty, such as those that occurred in the instant action, are traditionally relegated to state law remedies. *See Bolton,* 540 F.Supp. at 836 n. 17. In sum, "judicially creating a damages action in favor of [plaintiff] is unnecessary to ensure the fulfillment of Congress' purposes in adopting the Williams Act." *Piper,* 430 U.S. at 41, 97 S.Ct. at 949.

Under the same analysis, the Court finds that plaintiff does not have an implied cause of action under rule 14e–3. The cases cited by plaintiff are not controlling as they do not hold that a tender offeror has a private right of action for damages under rule 14e–3. *See Caleb & Co. v. E.I. DuPont de Nemours & Co.,* 615 F.Supp. 96 (S.D.N.Y.1985) (tendering shareholder has private right of action under rule 14e–3); *O'Connor v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1189–93 (S.D.N.Y.1981) (private right of action for damages under rule 14e–3 extended to options trader); *see*

*also Pryor v. United States Steel Corp.,* 591 F.Supp. 942, 961–62 (S.D.N.Y.1984) (shareholder has implied right of action under rule 14e–1(c)), *aff'd in part and rev'd in part,* 794 F.2d 52 (2d Cir.), *cert. denied,* 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986); *Camelot,* 535 F.Supp. at 1182–83 (target company and tender offeror have implied right of action for injunctive relief under rule 14e–3). Accordingly, defendants' motion for summary judgment on count two is granted.

### C. *Causation and Damages under RICO*

■ The Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1982) provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(c). This statute does not, however, afford a remedy for the mere existence of a RICO violation. *See Haroco, Inc. v. American Nat'l Bank and Trust Co.,* 747 F.2d 384, 398 (7th Cir. 1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). "Rather, the 'by reason of' language in the statute restricts the availability of RICO's treble damages to those who can show that a RICO violation was the proximate cause of their injury." *See Sperber v. Boesky,* 672 F.Supp. 754, 758 (S.D.N.Y.1987) (citing *Haroco,* 747 F.2d at 398), *aff'd,* 849 F.2d 60 (2d Cir.1988). "Hence, if the connection between a RICO violation and an injury is too attenuated, the injury can not be said to have been caused by the RICO violation, and therefore does not confer standing to complain about the violation." *Sperber,* 672 F.Supp. at 758 (citing *Sedima, S.P.R.L. v. Imprex Co., Inc.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)).

Litton, in its complaint, alleges that defendants violated 18 U.S.C. § 1962(a), (b), (c) and (d). Section 1962(a) makes it a crime for a person who has "received" in-come from a pattern of racketeering activity to "use or invest" such income.[9] Thus, subsection (a) does not make it a crime to engage in a pattern of racketeering activity, but rather, the crime lies in the use or the investment of the income derived from that activity. Thus, in order to state a claim under 1964(c) for a violation of 1962(a) a plaintiff must allege that he was injured by the use or the investment of income derived from racketeering activity. *See DeMuro v. E.F. Hutton,* 643 F.Supp. 63, 66 (S.D.N.Y.1986) (to state claim under 1962(a) plaintiff must allege injury by reason of the use or the investment of income derived from racketeering); *Whobrey v. Health–Mor, Inc.,* No. 85–9451, slip op, 1986 WL 303 (N.D.Ill. June 11, 1986) (citing cases) [available LEXIS] ("Absent some proximate causation between the alleged use or investment of the racketeering income and plaintiff's injury, plaintiffs cannot recover under [s]ection 1962(c) for a violation of [s]ection 1962(a)); *Donohoe v. Consolidated Operating & Prod.,* No. 86–7543, slip op, 1987 WL 5226 (N.D.Ill. Jan. 8, 1987) [available LEXIS] ("RICO defines the violation as the use or investment of racketeering derived income or its proceeds" and injury must stem from statutory violation as defined); *Cincinnati Gas & Elec., Co. v. General Elec., Co.,* 656 F.Supp. 49, 83–84 (S.D.Ohio 1986) (injury caused by conduct constituting violation for purposes of 1962(a) is use or investment of income). *But see Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 647 F.Supp. 1026, 1033 (N.D.Ill.1986) (injury suffered as result of predicate acts sufficient causation under 1962(a)); *Louisiana Power & Light v. United Gas Pipe Line,* 642 F.Supp. 781, 807 (E.D.La.1986) (to sue for violation of 1962(a) "plaintiff need only show that it was damaged by racketeering activity of defendant and that defendant used the money it got from the plaintiff in the operation of its business"); *Mix v. E.F. Hutton,*

---

**9.** Section 1962(a) provides in pertinent part: It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

No. 85–3108, slip op., (D.D.C. Sept. 29, 1986) [available LEXIS] (allegation that plaintiff injured in business or property by reason of defendant's violation of RICO sufficient, no additional injury required).[10]

Litton, as the nonmoving party, has failed to meet its burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e); see Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Litton has failed to offer any evidence, other than its own assertions in the complaint, that defendants' use or investment of racketeering proceeds injured it. Because it has failed to do so, partial summary judgment is appropriate.

Section 1962(c) prohibits anyone employed by or associated with an enterprise engaged in interstate commerce to participate "in the conduct of such enterprise's affairs through a pattern of racketeering."[11] Section 1961(1) defines racketeering in terms of federal and state crimes such as mail fraud, wire fraud or securities fraud. Although a concise definition has eluded the courts, see Huestis, RICO: The Meaning of Pattern Since Sedima, 54 Bklyn.L.Rev. 621 (1988), a pattern of racketeering requires the commission of at least two predicate acts within a ten year period. 18 U.S.C. 1961(5).

As with section 1962(a), a plaintiff can recover damages under 1962(c) only to the extent that he can establish injury to his business or property by the conduct constituting the violation. See Sedima, 473 U.S. at 496, 105 S.Ct. at 3285. Litton, however, has failed to establish that absent defendants' insider trading the Itek Board would have approved a takeover offer for less than $48 per share and Litton would, in fact, have acquired Itek for less money. Defendants' motion for partial summary

judgment on counts three and five, therefore, is granted.

Section 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

As with sections (a) and (c), "[s]ection 1962(b) requires a showing of a relationship or nexus between the pattern of racketeering activity and the interest or control obtained." Cincinnati Gas & Elec., 656 F.Supp. at 85 (citing United States v. Ladmer, 429 F.Supp. 1231, 1244 (E.D.N.Y. 1977)). Furthermore, Litton must establish a causal connection between defendants' interest or control and its injuries. See id. Litton has failed to establish such a connection. Accordingly, defendants' motion for partial summary judgment on count four is granted.

## 3. STATE COMMON LAW CLAIMS

### A. Causation and Damages under Fraud

To establish a claim of fraud under New York law a plaintiff must show (1) a material misrepresentation of an existing fact; (2) scienter; (3) reliance; and (4) causation. See Cantor v. Life Alert, Inc., 655 F.Supp. 673, 681 (S.D.N.Y.1987). "The absence of adequate causation is ... fatal to a common law fraud claim under New York law." Bennett v. United States Trust Co., 770 F.2d 308, 316 (2d Cir.1985) (citing Van Alen v. Dominick & Dominick, Inc., 441 F.Supp. 389, 403 (S.D.N.Y.1976), aff'd, 560 F.2d 547 (2d Cir.1977)), cert. denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

---

**10.** Although the Court agrees with those cases which hold that plaintiff must establish an injury resulting from the "use" or the "investment" of the income derived from racketeering activity, in the instant action, the issue is not dispositive. As previously noted in the discussion on section 10b and rule 10b–5, supra, plaintiff has failed to establish the existence of damages flowing from the predicate acts themselves.

**11.** Section 1962(c) provides

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of an unlawful debt.

"To establish the required causation the plaintiff must show that the loss was a 'direct result of the defendant's wrongful actions and [that it was] independent of other causes.'" *Bennett*, 770 F.2d at 308 (quoting *Idrees v. American Univ.*, 546 F.Supp. 1342, 1350 (S.D.N.Y.1982)). Litton's failure to establish causation, either in the context of RICO or federal securities laws, precludes the finding of a compensable injury under fraud. Defendants' motion for partial summary judgment on count seven is, therefore, granted.

### B. Causation and Damages under Intentional Interference

■ Although inartfully pleaded, count nine of Litton's second amended complaint alleges tortious interference with Litton's contractual rights under its confidential agreement with Lehman. Specifically, it would appear that Litton is alleging that defendants' misappropriation of confidential information and subsequent trading thereon caused it to pay more to acquire Itek.

To establish a claim of intentional interference with contractual relations under New York law a plaintiff must prove "(1) the existence of a valid contract; (2) that defendants had knowledge of that contract; (3) that the defendants intentionally procured the breach of that contract; and (4) that damages were suffered." *See Beacon Syracuse Assocs. v. City of Syracuse*, 560 F.Supp. 188, 201 (N.D.N.Y.1983) (citing cases); *see also Optivision, Inc. v. Syracuse Shopping Center Ass'n*, 472 F.Supp. 665, 684 (N.D.N.Y.1979) (citing cases).

Thus, an essential element of the tort of intentional interference with contractual relations is that the plaintiff suffered damages as a result of the interference. In the instant action, plaintiff has failed to establish the existence of a triable issue concerning its damages and, therefore, partial summary judgment is appropriate.

In addition, count nine alleges that defendants interfered with Litton's business relations with Itek. To establish a claim for interference with business relations a plaintiff must prove that "defendant[s] interfere[d] with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any way improper.'" *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983) (citations omitted); *see also Western Meat Co., Inc. v. IBP, Inc.*, 683 F.Supp. 415, 417 (S.D.N.Y.1988) (citing cases); *MidEast Systems and China Civil Constr. Saipan Joint Venture, Inc. v. Turner Int'l (Micronesia), Inc.*, 660 F.Supp. 864, 869 (S.D.N.Y.1987) (citing cases); *Brokers' Assistant, Inc. v. Williams Real Estate Co.*, 646 F.Supp. 1110, 1125 (S.D.N.Y.1986).

Although the parties have neglected to fully brief the issue, it may be gleaned from the papers that defendants are arguing that they could not have interfered with Litton's business relations with Itek as their actions did not cause Litton to pay more for Itek than it would have absent the insider trading. The Court agrees. Accordingly, partial summary judgment on count nine is granted.

## 4. STATE STATUTORY CLAIMS

### A. Private Right of Action under the Martin Act

■ Count twelve of Litton's second amended complaint alleges violations of the anti-fraud provisions of the Martin Act, N.Y. General Bus. Law § 352-c ["section 352-c"].[12] Defendants move for summary

---

**12.** Section 352-c of New York's General Business Law provides that:

    1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

    (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase

judgment on this issue contending that there is no implied private right of action under section 352–c. The issue must be resolved in accordance with New York law. *See* 19 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* §§ 4507, at 89, 4515 (1982); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956) ("it is the source of the right sued upon, and not the ground on which federal jurisdiction ... is founded, which determines the governing law"). The holding of New York State's highest court is, therefore, dispositive.

Recently, the New York Court of Appeals held that "there is no [private] cause of action [expressly or] impliedly created under section 352–c." *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116, 118 (1987). *Accord Green v. Santa Fe Indus., Inc.*, 70 N.Y.2d 244, 519 N.Y.S.2d 793, 798, 514 N.E.2d 105, 110 (1987); *Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 519 N.Y.S.2d 801, 803, 514 N.E.2d 113, 115 (1987). In *CPC Int'l* a majority of the court concluded that an implied private action [would not be] consistent with the legislative scheme underlying the Martin Act and, specifically, section 352–c; [and] that the specific purpose of the statute was to create a statutory mechanism in which the Attorney–General would have broad regulatory and remedial powers to prevent fraudulent securities practices by investigating and intervening ... and, thereafter, if appropriate, [commencing] civil or criminal prosecution.

519 N.Y.S.2d at 807, 514 N.E.2d at 119. Although the court was unanimous in its belief that a private cause of action was desirable, legislative intent required a finding that "the particular purpose of section 352–c is the creation of an enforcement mechanism within which a private action is not implied." *Id.* at 808, 514 N.E.2d at 119. Accordingly, defendants' motion for summary judgment on count twelve is granted.

**B.** *Private Right of Action under N.Y. Business Corporation Law*

■ Count thirteen of Litton's second amended complaint alleges violations of

within or from this state of any securities or

section 1609(b) of New York's Business Corporation Law ["section 1609"].

Section 1609 provides that

(a) No person shall make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any takeover bid or any solicitation of offerees in opposition to or in favor of any such takeover bid.

(b) It shall constitute a violation of this article for any person who is possession of material information relating to any takeover bid, which information he knows or has reason to know is nonpublic, which he acquired either before or after the commencement of the take-over bid, and which he knows or has reason to know has been acquired directly or indirectly from an offeror, a target company, or any officer, director, partner or employee or any other person acting on behalf of the offeror or target company, to purchase or sell or cause to be purchased or sold, within or from this state, any securities sought or to be sought by such takeover bid....

Defendants now move for summary judgment on this claim contending that a tender offeror does not have a private right of action under section 1609. The Court agrees. Section 1609 was patterned substantially after Rule 14e–3, *see* N.Y.Bus. Corp. Law, Art. 16, Practice Commentaries at 25 (McKinney Supp.1988), and shares the same underlying legislative purpose of protecting a target company's shareholders. *Id.* at 21; *see also* N.Y.Bus.Corp. Law § 1612, Notes (McKinney 1986).

Moreover, state courts have generally followed the approach of the federal courts in determining whether an implied right of action exists. *See Condec Corp. v. Farley*, 578 F.Supp. 85, 87 n. 1 (S.D.N.Y.1983) (citing cases). The Court, as discussed *supra*,

commodities....

has already determined that under the factors enumerated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), Litton does not have an implied private right of action under 14e–3.

More importantly, N.Y.Bus.Corp. Law § 1613 expressly provides a private right of action to "any offeree whose equity securities are the subject of a takeover and who has been injured by any violation of the [N.Y.Bus.Corp. Law]." "This private right of action was added to provide for more comprehensive protection to New York shareholders in the event of a failure to provide adequate full disclosure...." N.Y.Bus.Corp. Law, Art. 16, Practice Commentaries at 26 (McKinney Supp.1988). Litton, therefore, falls outside the class the statute was designed to protect, *cf. Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 42, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1976) ("defeated tender offeror, has no implied cause of action for damages under § 14(e)"), and the provision for a limited private right of action reinforces the conclusion that there is no broader implied private right. *Cf. Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979) (no implied right of action under 17(a), "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly"). For all of the foregoing reasons, defendants' motion for summary judgment on count thirteen is granted.

## CONCLUSION

Defendants' motion for partial summary judgment is granted. Fed.R.Civ.P. 56(d).